LUKENS STEEL COMPANY

v.

Juanita M. KREPS, Secretary of Commerce, Robert T. Hall, Assistant Secretary of Commerce, and Phoenix Steel Corporation.

Civ. A. No. 79–1053.

United States District Court,
E. D. Pennsylvania.

Aug. 22, 1979.

Robert M. Landis, Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

Stanley D. Wright, U. S. Dept. of Justice, Washington, D. C., Robert S. Fastov, Economic Development Adm'n, U. S. Dept. of Commerce, Washington, D. C., for Federal defendants.

Robert S. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for Phoenix Steel.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

### I. *Introduction*

Plaintiff, Lukens Steel Company (Lukens), a producer of specialty steel products with its principal facility in Coatesville, Pennsylvania, has brought this action for declaratory and injunctive relief to prohibit the Economic Development Administration (EDA) of the United States Department of Commerce and its officers and agents from providing direct loan guarantees to or for the benefit of Phoenix Steel Corporation (Phoenix), another producer of specialty steel with plants in Phoenixville, Pennsylvania and Claymont, Delaware. The EDA assistance to Phoenix which Lukens challenges is an offer, issued by EDA on March 19, 1979, to guarantee ninety percent (or $29,039,400) of the rental obligation to be incurred by Phoenix under a proposed "leveraged lease" of capital equipment. The specific projects for which Phoenix sought assistance are:

 I. Claymont Delaware Plant
 a. vacuum degassing
 b. heavy plate
 c. specialty finishing
 d. pollution control equipment
 II. Phoenixville Pennsylvania Plant
 a. finishing expansion
 III. Corporate Level
 a. data processing facilities

Lukens challenges three of these projects—the vacuum degasser, the heavy plate program, and the specialty finishing program, all of which are planned for the Claymont plant.[1]

---

1. Lukens does not produce steel pipe or tube products, so it does not challenge the assistance to the Phoenixville pipe and tube facility. The pollution control and computer projects are not challenged, since Lukens admits that they have no impact upon production. The head spinning project is not at issue, since that portion of Phoenix' application was denied by EDA.

■ Jurisdiction for this action has been predicated upon § 701 of the Public Works and Economic Development Act (the Act), 42 U.S.C. § 3211, § 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–6, and 28 U.S.C. §§ 1331, 1361, 2201 and 2202. Lukens contends that EDA's approval of the lease guarantee was beyond the scope of EDA's authority and that it was "arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law" in that EDA:

1) violated the unfair competition provision of the Act, § 702 (42 U.S.C. § 3212);

2) violated the 15% contribution provision of EDA's regulations, 13 CFR § 306.-14;

3) erroneously concluded that Phoenix does not have access to normal markets and cannot generate needed funds internally;

4) erroneously concluded that Phoenix can reasonably be expected to repay the loan;

5) generally violated other portions of the Act, regulations and guidelines.[2]

■ Lukens instituted this action against the federal defendants only, and the Court granted leave to Phoenix to intervene as a party defendant. The federal defendants, Phoenix, and Lukens have each filed motions for summary judgment. For the reasons hereinafter set forth, these motions

will be denied and the Court will enter an Order, pursuant to Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706, holding unlawful and setting aside the EDA's action, findings and conclusions and remanding the matter for further consideration in accordance with this Memorandum.[3]

## II. History of the Project

The assistance sought by Phoenix is part of an administrative program to assist the United States domestic steel industry. The program began with the convening by President Carter of a task force, chaired by Undersecretary of the Treasury Anthony M. Solomon, to investigate the problem of increasing unemployment in the steel industry. The task force, in its report of December 6, 1977,[4] identified the following problems faced by the steel industry.

1) serious erosion of its competitive position;

2) a need to reinvest heavily in modernization in order to remain competitive;

3) a need to make substantial expenditures to meet environmental regulations; and

4) a continued difficulty in raising capital for these expenditures under present market conditions, given the industry's recent unsatisfactory return on investment.

**2.** Phoenix contends that Lukens lacks standing to raise any issue other than unfair competition. We disagree. Once a party is within the zone of protected interest, as Lukens unquestionably is with respect to the unfair competition provision, § 702, that party may raise any relevant question of law. *Iowa Independent Bankers v. Board of Governors of Federal Reserve System,* 167 U.S.App.D.C. 286, 511 F.2d 1288 (D.C.Cir.), *cert. denied,* 423 U.S. 875, 96 S.Ct. 144, 46 L.Ed.2d 106 (1975).

**3.** When administrative action is before the Court for review on motions for summary judgment and the agency's action is not supportable on the record, the matter is appropriately remanded to the agency. *See Camp v. Pitts,* quoted at p. 451, *infra.* According to Professor Moore:

On the other hand, a denial of summary judgment does not necessarily mean triable

issues of fact exist. In actions to review agency decisions where a trial *de novo* is precluded, a denial of a motion for summary judgment by a party is normally based on one of two possible grounds: either the opposing party is entitled to judgment based on the record and applicable law, or a remand to the agency is required because the particular agency action is not supported by the record or law under applicable standards of review, and further proceedings by the agency are necessary.
6 Moore's Federal Practice, ¶ 56.17[3] at 56–595 n. 6.

**4.** Report to the President: A Comprehensive Program for the Steel Industry, December 6, 1977 (unpublished report, appendix to brief of federal defendants).

The task force concluded that federal assistance was needed to aid steel firms in financing the necessary capital expenditures for modernization and pollution control which would help to restore their profitability. The task force recommended that ". . . additional funds be made available for the current and future budget of the Economic Development Administration of the Department of Commerce for industrial loan guarantees and continue to provide further appropriations for this loan guarantee fund in the next few years. . . . We feel the use of EDA guarantees is the simplest and most direct way to assure that viable modernization projects of these firms actually receive the funds necessary for their completion." The task force further suggested that steel firms meeting all of the following criteria be considered eligible for loan guarantees and be given priority:

—firms with serious financial problems, with little or no access to capital markets;

—firms seeking funds for modernization of plants located in areas of high and rising unemployment or threatened massive layoffs; and

—firms with viable plans for modernization.

The EDA responded to the task force report by developing a program of loan guarantees for the steel industry, with funds to be provided under sections 202,[5] 203[6] and 204[7] of the Act, and the regulations promulgated pursuant thereto at 13 CFR, Chapter III. Specific guidelines for the administration of the steel industry lending program were published at 43 Fed. Reg. 16360 (April 18, 1978). The guidelines set forth the purpose of the program as follows:

> The purpose of this program is to assist in providing the necessary financing to make facilities competitive, restore employment or sustain existing employment, or to make possible the establishment of new jobs.

Assistance is available to steel companies for the following projects:

A. Modernization that will be reflected in improved profitability, including but not limited to, financing the following:

1. Production related improvements in plant, machinery and equipment, including the integrating of proven modern industrial technology into facilities which are obsolete or are approaching obsolescence. *These improvements would be designed to lower unit costs, and to permit firms to re-establish prior levels of production on a profitable basis.*

2. Product related capital and organizational improvements which enhance profitability by improving the quality of existing product(s) or by facilitating production of new product(s).

3. Financial efficiencies designed to provide solvency for a period of time sufficient to permit realization of profits on capital improvements thereby ensuring employee retention and continued operation of facilities during implementation of modernization plans.

4. Improvements in plant operations systems which will improve organizational efficiency and/or reduce overhead and thereby enhance profitability.

Applicants are cautioned that loan guarantees will not normally be available for installation of unproven technology. Technology new for the firm in question, or for the United States, is eligible for financing if it has been used and proven effective elsewhere. EDA is willing to consider scaling up of proven technology to volume levels contemplated by the firm.

B. Modernization which is required by law or regulations, but which is not directly reflected in improved profitability, including but not limited to the following:

---

5. 42 U.S.C. § 3142, Business Loans and Guarantees.

6. 42 U.S.C. § 3143, Economic Development Revolving Fund.

7. 42 U.S.C. § 3144, Redevelopment Area Loan Program.

1. Pollution control equipment.

2. Health and safety related improvements.

In order for these kinds of costs to be eligible for this program, the firm must demonstrate that it cannot finance these costs from cash flow or normal credit sources without seriously affecting its viability and its ability to maintain employment. (emphasis added).

In April, 1978, Phoenix applied for lease guarantee assistance under the steel program. On March 19, 1979, EDA issued its offer [8] to guarantee ninety percent (or $29,039,400) of the rental obligations to be incurred by Phoenix under a proposed "leveraged lease" of capital equipment. Lukens challenges that part of the EDA guarantee which would assist Phoenix in acquiring the following equipment:

1. *Vacuum Degassing*—Vacuum degassing is a relatively economical method of manufacturing "degassed" steel—that is, carbon or alloy steel with low hydrogen or oxygen content, which is regarded as being of high quality.[9] Phoenix proposes to acquire the basic equipment to perform a process known as "ladle degassing". In this process, a full ladle of steel is placed in a vacuum vessel, and the pressure is lowered.[10]

2. *Heavy Plate*—At the present time, Phoenix can manufacture steel plates in sizes up to six inches in thickness or "gage", 152 inches in width, and 720 inches in length.[11] However, when customers request the larger sizes (normally three to six inches in gage, weighing 25,000 to 30,000 pounds), Phoenix is required to supply two single plates to be welded together.[12] The heavy plate equipment Phoenix proposes to acquire, consisting largely of new pits to heat ingots and new cranes to handle the heavier plates, will permit it to manufacture the large plates in a single form.[13] This is a less costly process than welding two smaller plates.[14]

3. *Specialty Finishing*—Currently, Phoenix processes three products in its 2100° Driver furnace—carbon and alloy plate, clad plate and stainless plate.[15] Because the heat treatment of these products is accomplished at different temperatures, it is necessary to operate the furnace at alternately high and low temperatures—an inefficient and costly method. Phoenix proposes to acquire a new furnace for the heat treatment of carbon and alloy plate, continuing to use the existing furnace for clad and stainless plate.[16]

These are projects for the manufacture of "specialty" steels, a market in which Phoenix and Lukens are direct competitors. While other steel companies also manufacture specialty steels, Lukens and Phoenix are the only two firms in the country which manufacture one particular specialty steel, hot roll-bonded clad plate.[17] Thus, Lukens challenges the EDA assistance on the ground that the three projects mentioned above will give Phoenix an unfair competitive advantage in markets where the two firms are in direct competition.

III. *Scope of Review*

 The initial inquiry, which must precede an examination of the administrative decision to extend financial assistance to Phoenix, must focus on the scope of this Court's review. One thing certain, it is not the function of this Court to substitute its judgment as to whether the assistance

---

8. VII A.R. 1128 (citations to the administrative record refer to volume and page number).

9. VI A.R. 1011.

10. V A.R. 694–5.

11. VI A.R. 1016.

12. VII A.R. 1052.

13. VI A.R. 972.

14. VII A.R. 1052.

15. Phoenix does not manufacture stainless steel, but does stainless steel conversion on a fee basis for customers who provide stainless ingots to be rolled into plate.

16. VI A.R. 1011–12.

17. VII A.R. 1057.

should be granted. Whether the EDA's decision was a wise one, or even a desirable one, is not for the Court to decide. The district court does not sit as a super-agency empowered to substitute its judgment for that of the agency. Evidence-weighing must be left to the agency making the policy decision. *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368 (2d Cir. 1977). As stated by Judge Skelly Wright in *Ethyl Corp. v. Environmental Protection Agency,* 176 U.S.App.D.C. 373, 408, 541 F.2d 1, 36 (D.C. Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), "It is settled that we must affirm decisions with which we disagree . . . ." It is our obligation, however, to give thorough consideration to each and every one of plaintiffs' allegations in making the review mandated by the Administrative Procedure Act.

EDA's decision to provide financial assistance to Phoenix is the same type of informal agency action which was considered by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and by this Court in *Philadelphia Council of Neighborhood Organizations v. Coleman,* 437 F.Supp. 1341 (E.D.Pa.1977), *aff'd,* 578 F.2d 1375 (3d Cir. 1978).

Section 10(e) of the Administrative Procedure Act (5 U.S.C. § 706) provides:

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

*Overton Park* held that informal agency decision-making is subject to review only under sub-sections 2(A), (B), (C) and (D) of Section 706, which confine a court to determining whether the agency acted within the scope of its authority; whether the decision made was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; and, finally, whether the agency conformed to the necessary procedural requirements. 401 U.S. at 414, 91 S.Ct. 814. Since no question has been raised as to compliance with procedural requirements, the only issues presented in this litigation are (1) whether the EDA acted within the scope of its authority, and (2) whether EDA's actions, findings and conclusions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

We must first decide whether under § 706(2)(C) of the Administrative Procedure Act, EDA acted within the scope of its authority under the unfair competition provision of the Act, § 702. If we find that EDA acted within the scope of its authority, we must then consider, pursuant to § 706(2)(A) of the Administrative Procedure Act, whether the agency's actions, findings and conclusions in connection with the challenged assistance to Phoenix were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Such a two-phase analysis was recently followed by our Third Circuit in *National Industrial Sand Ass'n. v. Marshall,* 601 F.2d 689 at 697–700 (1979).

In *National Industrial Sand Association, id.* at 698, the Court articulated the following standard of review as to whether the agency acted within the scope of its authority in interpreting a statute:

> We think that the weight which we should ascribe to the Secretary's interpretation of the Mine Act is aptly set forth in the Supreme Court's opinion in *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965):
>
>> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Comm'n v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136. See also, *e. g., Gray v. Powell,* 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; *Universal Battery Co. v. United States,* 281 U.S. 580, 583, 50 S.Ct. 422, 74 L.Ed. 1051. "Particularly in this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'" *Power Reactor Co. v. Electricians,* 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924.

*Accord, Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Red Lion Broadcasting Co. v. F. C. C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Atchison, T. & S. F. Ry. Co. v. I. C. C.,* 188 U.S.App.D.C. 360, 366, 580 F.2d 623, 629 (D.C.Cir. 1978).

*See also, Brennan v. Western Union Tel. Co.,* 561 F.2d 477, 482 (3d Cir. 1977); *Budd Co. v. Occupational Safety and Health Review Comm'n,* 513 F.2d 201, 204–5 (3d Cir. 1975). The Supreme Court recently discussed the reasons for this judicial deference to the agency's interpretation of a statute in *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979):

> It is a commonplace in our jurisprudence that an administrative agency's consistent, longstanding interpretation of the statute under which it operates is entitled to considerable weight. *United States v. National Assn. of Securities Dealers,* 422 U.S. 694, 719 [95 S.Ct. 2427, 45 L.Ed.2d 486] (1975); *Saxbe v. Bustos,* 419 U.S. 65, 74 [95 S.Ct. 272, 42 L.Ed.2d 231] (1974); *Investment Co. Institute v. Camp,* 401 U.S. 617, 626–27 [91 S.Ct. 1091, 28 L.Ed.2d 367] (1971); *Udall v. Tallman,* 380 U.S. 1, 16 [85 S.Ct. 792, 13 L.Ed.2d 616] (1965). This deference is a product both of an awareness of the practical expertise which an agency normally develops, and of a willingness to accord some measure of flexibility to such an agency as it encounters new and unforeseen problems over time. But this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose and history.

Thus, if EDA's interpretation of § 702 does not do violence to the clear meaning of the statute, we are obliged to view it with deference in making our determination as to whether the EDA acted within the scope of its authority.

 In reviewing the EDA's decision to provide the challenged assistance to Phoenix, the Court must determine whether the agency's actions, findings, and conclusions were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." The agency's decision is entitled to a "presumption of regularity" *Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. 814. In defining the "arbitrary and capricious" standard of review, the Supreme Court stated at 401 U.S. 416–17, 91 S.Ct. 823–824:

> To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

In *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Supreme Court reaffirmed the use of the arbitrary, capricious, or abuse of discretion standard. Judge Skelly Wright, interpreting *Overton Park* and *Camp* in *Ethyl Corp. v. Environmental Protection Agency*, 176 U.S.App. D.C. 373, 406, 541 F.2d 1, 34 (D.C.Cir. 1976), said:

> [The arbitrary and capricious] standard of review is a highly deferential one. It presumes agency action to be valid . . . Moreover, it forbids the court's substituting its judgment for that of the agency, and requires affirmance if a rational basis exists for the agency's decision.

> This is not to say, however, that we must rubber-stamp the agency decision as correct. To do so would render the appellate process a superfluous (although time-consuming) ritual. Rather, the reviewing court must assure itself that the agency decision was "based on a consideration of the relevant factors." Moreover, it must engage in a "substantial inquiry" into the facts, one that is "searching and careful." (citations and footnotes omitted).

The arbitrary and capricious standard is essentially the appellate rational basis test. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Baltimore and Ohio C.T.R. Co. v. United States*, 583 F.2d 678, 685 (3d Cir. 1978).

 In applying the arbitrary and capricious standard, the court's review is confined to the administrative record,[18] where

the record affords a sufficient contemporaneous explanation of the administrative decision to permit a determination as to whether the result was arbitrary, capricious, or an abuse of discretion. *Philadelphia Council, supra*, 437 F.Supp. at 1349. As the Supreme Court stated in *Camp*, 411 U.S. at 143, 93 S.Ct. at 1244:

> . . . in the present case there was a contemporaneous explanation of the agency decision. The explanation may have been curt, but it surely indicated the determinative reason for the final action taken . . . The validity of the [administrator's] action must, therefore, stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review. If the finding is not sustainable on the administrative record made, then the [administrator's] decision must be vacated and the matter remanded to him for further consideration.

## IV. Did EDA Act Within the Scope of Its Authority?

Section 702 of the Act (42 U.S.C. § 3212) provides:

> § 3212. Prevention of unfair competition

> No financial assistance under this chapter shall be extended to any project when the result would be to increase the production of goods, materials, or commodities, or the availability of services or facilities, when there is not sufficient demand for such goods, materials, commodities, services, or facilities, to employ the efficient capacity of existing competitive commercial or industrial enterprises.

EDA has promulgated regulations interpreting § 702. These regulations (13 CFR § 309.2) provide:

> § 309.2 Unfair competition.

---

**18.** The Administrative record which is before the Court in this case consists of 2,922 pages contained in sixteen volumes. The first five volumes (778 pages) contain Phoenix's application materials. Financial data are collected in volumes X, XII, XIII, XIV and XV. Other materials in the record include supplemental application materials submitted b, Phoenix, and a

variety of correspondence and news clippings. In addition to memoranda prepared by EDA staff, the record also contains the findings and recommendations of Battelle Memorial Institute, a consultant to EDA with special expertise in the steel industry. Lukens participated in the administrative review process, submitting documents which are part of the record.

No financial assistance under the Act shall be extended to any project which will directly increase the production of goods, materials, or commodities, or the availability of services or facilities, when there is not sufficient demand for such goods, materials, commodities, services, or facilities to employ the efficient capacity of existing competitive commercial or industrial enterprises, as required by section 702 of the Act.

(a) *Definitions.* As used is this section:

"Demand" means the amount of the product or service which can reasonably be expected to be purchased for use in the market area to be served by the project or its intended principal industrial or commercial beneficiary.

"Capacity" means that quantity of production or supply of services which could reasonably be expected to be produced or supplied over a sustained period of time by existing competitive enterprises for use within the market area under working schedules historically customary for the industry.

"Efficient Capacity" means that part of the capacity which is produced or supplied by existing competitive enterprises employing well-designed structures, equipment, machinery, and designs and techniques that are comparable to current practices.

"Existing Competitive Enterprise" means an established facility which either produces the same product or supplies the same service to the market area or a significant part thereof.

"Financial Assistance" means any grant, loan, guarantee, or purchase of evidence of indebtedness by EDA pursuant to the authority of the Act, and any contract, purchase order, task order or work order in an amount in excess of $10,000.00 which is directed toward an increase in the productive capacity for goods or services by a specific enterprise either existing or prospective.

(b) *Determinations.* Determinations of whether approval of a project will violate this section shall in all cases (except those described in paragraph (e) of this section) be based on a "702 Study."

(c) *Procedures for preparing a "702 Study" for business loan and public works projects.* Where financial assistance under the Act is requested for a Public Works or Business Loan project the following procedures shall be followed to the extent necessary to provide the Agency with sufficient information to prepare a "702 Study."

(1) The applicant shall submit, in connection with the project for which financial assistance is being sought, all of the information reasonably available concerning the following:

(i) Proposed product(s) or service(s).

(ii) Project capacity.

(iii) Market area where product or service is to be sold.

(iv) Supply of product or service currently available in market area and sources thereof.

(v) Percent of market expected to be taken by project.

\* \* \* \* \* \*

(e) *Projects not requiring a "702 Study".* Financial assistance under the Act may be provided to a project without a "702 Study" where EDA determines such project meets one of the following criteria:

(1) The project to be assisted is not designed to provide public works facilities in order primarily or essentially to benefit a particular firm or industry, but is designed primarily for the benefit of the community or area as a whole or for general industrial or commercial purposes, or

(2) *The extension of financial assistance will not result in a significant increase in production or services that have heretofore been available in the area, because its purpose is to:*

(i) Replace or restore capacity recently destroyed by flood, fire, wind, or other disaster; or

(ii) *Assure the retention of existing capacity and employment; or*

(iii) Replace, rebuild or modernize, within the same labor market area, facilities displaced by an official action, including but not limited to actions resulting from public construction projects, land use condemnation procedures, and/or requirements under environmental control ordinances or laws. The original owners of the affected facilities will be given first opportunity for EDA assistance. If, after a reasonable period of time the original owners fail to take advantage of these opportunities, other producers within the area may qualify for assistance to replace the affected facilities; or

\* \* \* \* \* \*

(emphasis added).

The procedures set forth in the above-quoted regulations for making the "unfair competition" determination have received the approval of at least one court. *Afton Alps, Inc. v. United States,* 392 F.Supp. 543 (D.Minn.1974).

Section 702 prohibits financial assistance when its result would be to increase production in an industry where there is not sufficient demand to employ the efficient capacity of existing enterprises. The parties do not take issue with the EDA's finding that there is not sufficient demand for products of the type produced by Phoenix to employ the efficient capacity of existing enterprises.[19] EDA takes the position that it was not necessary to make such a determination, in view of EDA's finding that the proposed financial assistance will not result in a significant increase in production. Lukens, however, vigorously contests the EDA finding that its offer of assistance in connection with the vacuum degassing, heavy plate, and specialty finishing projects will not result in a significant increase in production, prohibited by § 702.

The regulations promulgated by EDA in connection with § 702 (13 CFR § 209.2(e)(2) provide, *inter alia,* that § 702 does not prohibit financial assistance which "will not result in a significant increase in production . . . that [has] heretofore been available in the area, because its purpose is to . . . [a]ssure the retention of existing capacity and employment." Because this regulation speaks in terms of capacity, the agency draws a distinction between increases in production which result from capacity-increasing new facilities, and those which are the consequence of quality-improving and cost-reducing modernizations of existing facilities. Interpreting the statute and regulations in the specific context of the proposed assistance to Phoenix,[20] EDA, in its final memorandum concerning § 702, sets forth the standard as whether "the extension of financial assistance will . . . result in a significant increase in production over recent historical levels." [21] EDA finds an increase in production to be insignificant if it is so small as to have no measurable effect on competitors.[22] The "recent historical level" chosen by EDA as the standard of comparison in this case was the year 1973, a recent peak year when Phoenix' competitive position was more favorable. EDA and Phoenix contend that the selection of this year as the standard of comparison, rather than the year in which Phoenix applied for assistance, permits the fulfillment of the steel program's goal of reestablishment or prior levels of production on a profitable basis.[23]

Lukens, on the other hand, argues that this interpretation of § 702 is at variance with the plain meaning of the statute, which it contends prohibits anything other than a *de minimis* increase over the current level of production.

The issue presented as to scope of authority, therefore, is whether the limitation of

**19.** VI A.R. 1032.

**20.** EDA has rendered five separate opinions in this case as to whether the offered assistance will violate § 702. July 31, 1978 (VI A.R. 856); November 22, 1978 (VI A.R. 928); December 22, 1978 (XV A.R. 2542); January 19, 1979 (VI A.R. 1032); March 16, 1979 (VI A.R. 779).

**21.** VI A.R. 780–81.

**22.** VI A.R. 780.

**23.** *See* Steel Program Guidelines, pp. 447–448, *supra.*

§ 702 should be as interpreted by EDA, i. e., prohibiting significant increases in production over an historical peak level, or, as contended by Lukens, i. e., prohibiting anything other than a *de minimis* increase over the current production level.

EDA considers its interpretation of § 702 to be entitled to special deference as a contemporaneous interpretation, pointing to some ninety instances where the regulations have been applied.[24] It has not, however, pointed out any such specific interpretation as the one at issue here, where increase in production is defined by measurement against a recent historical peak. Although the published regulations reflect practices of long standing, it may be that the definition employed by EDA in this case is not entitled to special deference as a contemporaneous interpretation. It is, however, an administrative interpretation which the Court must view with deference, whether or not it is the same interpretation the Court would have made if the issue has arisen in the first instance before the Court.[25]

■ In statutory interpretation, a particular clause is not to be viewed in isolation:

When "interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature . . . ."

*Kokoszka v. Belford*, 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974); *see also Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975).

Congress has declared that the purpose of assistance under the Act is to provide for "long-term economic rehabilitation in areas where long-term economic deterioration has occurred or is taking place."[26] Such areas are designated redevelopment areas, and EDA is expressly authorized to aid private enterprises in those areas in an effort to reverse the trend of unemployment and economic deterioration.[27] The steel program carries a specific mandate to assist steel companies in economic difficulty to reestablish prior levels of production on a profitable basis.[28] Thus, there is a basic tension between § 702's limitation on increased production which would have an unfair competitive effect, and the basic purpose of EDA assistance, which is to promote the economic recovery of industries experiencing financial difficulty. The Court in *Afton Alps, supra*, 392 F.Supp. at 549, was not faced with precisely the same issue that is presented in this case, since the industry involved, the ski industry, was fully utilizing its efficient capacity. Nonetheless, the Court there recognized that a tension existed between § 702 and the basic purpose of the Act:

Certainly, it is reasonable to conclude that Section 702 cannot be meant to proscribe all competition. There will inevitably be a tension between that section's command and the aim of the Act to promote development in economically depressed areas. In light of that tension, this Court cannot say that the EDA's interpretation permitting new applicants to serve the new growth is plainly erroneous or inconsistent with the law.

In determining whether to provide assistance under the Act, the agency is also required to balance the tension between § 202(b)(4),[29] which requires that an applicant be unable to obtain private financial support, with § 202(b)(6),[30] which requires that the applicant provide a reasonable assurance that a loan made or guaranteed by EDA will be repaid.

24. VI A.R. 794, 813.

25. *See* National Industrial Sand, p. 450, *supra*.

26. 42 U.S.C. § 3121.

27. 42 U.S.C. § 3142.

28. *See* Steel Program Guidelines, pp. 447–448, *supra*.

29. 42 U.S.C. § 3142(b)(4).

30. 42 U.S.C. § 3142(b)(6).

Recently, the District of Columbia Circuit has found a compromise fashioned by the agency to be an appropriate means of reconciling inconsistent statutory provisions: In *Citizens to Save Spencer County v. Environmental Protection Agency,* 195 U.S.App. D.C. 30 at 56–57, 600 F.2d 844 at 870–871 (D.C.Cir. 1979), the Court stated:

> In the present case, therefore, we are guided by the rule that the maximum possible effect should be afforded to all statutory provisions, and, whenever possible, none of those provisions rendered null or void. We hold that this principle applies with equal strength when statutory provisions are in certain respects inconsistent; if the inconsistent provisions *point generally in a common direction* . . . it is the task of an agency with the requisite authority to pursue a middle course that vitiates neither provision but implements to the fullest extent possible the directives of each, and it is the task of a reviewing court to ensure that the agency has effected an appropriate harmonization of the conflicting provisions while remaining within the bounds of that agency's statutory authority. In devising such a course, it is appropriate for the agency, as courts have so often done, to look for guidance to the statute as a whole and to consider the underlying goals and purposes of the legislature in enacting the statute, while avoiding unnecessary hardship or surprise to affected parties and remaining within the general statutory bounds prescribed. Only by this approach can legislative purposes and statutory instructions be given the greatest possible practical effect. (footnotes omitted).

██ We find that EDA's interpretation of § 702 in this case, determining whether there is a significant increase in production when measured against a recent profitable year, is not contrary to the plain meaning of § 702 when viewed in the total context of the intent of Congress as expressed in the Act. The agency's interpretation of § 702, which forbids assistance that would result in a significant increase in productive capacity, while permitting quality-improving and cost-reducing modernizations which insignificantly increase production when measured against profitable production levels, is a reasonable interpretation which reconciles existing tensions in the Act.

It would appear, therefore, that EDA has the authority to render assistance for the purpose of modernization and improvement of existing facilities which results in some increase in production. The legislative history supports this conclusion. Section 702 was added to the Act by Representative Cleveland of New Hampshire. His statement at the time the amendment was introduced is inconclusive as to the precise definition of prohibited increases in production:

> [EDA's predecessor] has been rightfully criticized for building factories which contribute to oversupply and overcapacity. For example, they built a shoe factory in Indiana at a time when shoe factories in New Hampshire were closing because of oversupply. They have constructed pulp and tissue mills at a time when problems of oversupply were seriously affecting these industries in my State, and the same can be said for plywood and other industries The purpose of my amendment would be to prevent this type of shocking and prodigal waste of Government money and this gross unfairness to American taxpayers. This amendment to prevent unfair competition touches on the whole problem of industrial and job piracy. By adopting this amendment, the House can do much to improve this legislation.[31]

However, at subsequent oversight hearings Representative Cleveland appears to suggest that improvements to existing facilities would not come within § 702's prohibition:

> It sort of gets back to the genesis of this amendment, which was: How do you

---

**31.** H.R.Rep.No.539, 89th Cong., 1st Sess. 59 (1965), U.S.Code Cong. & Admin.News, pp. 2788, 2836.

explain—I have to explain to my constituency, and to my own conscience; how can you explain to a taxpayer the Federal Government financing competition that may literally knock him out of business, and using his own tax dollars to do it? This is really what we are trying to get at with this amendment; and I think if you kept it on a percentage business, with small increments, increasing production where you have an existing plant, that this would certainly help in that type of situation.[32]

Similarly, Senator Weicker of Connecticut, at oversight hearings specifically relating to the steel program, observed: "'I thought the purpose of government assistance was to provide for modernization of facilities to make a company more efficient, not to expand capacity in the industry." [33]

An interpretation of § 702 which looks to productive capacity and permits EDA to render assistance which results in an insignificant increase in production when measured against a recent peak year is, moreover, an interpretation which gives meaning to the purposes underlying the Act and the steel program guidelines. In order to qualify for assistance, a firm must be in economic difficulty.[34] Any business in economic difficulty over a period of time will generally experience lower production and lower sales. This certainly has been the experience in our steel industry. Interpreting § 702 as an absolute inflexible prohibition against any assistance which would cause production to increase above the level at the date of the application or at the date assistance is granted would ensure that firms experiencing difficulty would not recover. This interpretation, advocated by Lukens, might well prohibit any assistance to the steel industry and defeat the clear mandate of Congress.[35]

On the other hand EDA's selection of 1973, a recent peak year when Phoenix competitive position was more favorable, is an application of § 702 which gives meaning to the purpose of the Act. The application of this standard will enable Phoenix to modernize an operating industrial plant, permitting it to reduce its costs of production and thus to remain a viable participant (and employer) in the marketplace.

■ We therefore find that EDA acted within the scope of its authority and did not violate section § 702 in offering the challenged assistance to Phoenix.

## V. Were EDA's Actions, Findings, and Conclusions Arbitrary and Capricious?

### A. EDA'S Factual Determinations As To Whether The Requirements of § 702 Have Been Satisfied.

■ Having discussed EDA's legal interpretation of § 702, we must review the record to determine whether there is a rational basis for the agency's conclusion that the statutory requirements have been satisfied. EDA rendered five separate § 702 opinions in this case, seeking to reconcile all of them in its final memorandum.[36] Lukens considers this series of opinions to be "flip-flops", motivated by political considerations; we find no reason, however, to consider them to represent anything other than changes in the agency's opinion which

---

**32.** Administration of Section 702 under the Public Works and Economic Development Act of 1965, House of Representatives Hearings Before the Special Subcommittee on Economic Development Programs, June 21 and July 25, 1968, at 193–94. (hereinafter 1968 § 702 Oversight Hearings).

**33.** SBA 8(a) Program and EDA Steel Industry Reprogramming, Senate Hearings Before a Subcommittee of the Committee on Appropriations, March 3, 1978 at 160.

**34.** 42 U.S.C. § 3142; Steel Program Guidelines, pp. 447–448, *supra*.

**35.** Representative Cleveland advised EDA officials that § 702 was not intended to bar all assistance:

> We do not want to have a situation where you people get so gun shy that 702 is totally going to prohibit you from making any loans. There is always a risk, and one of the elements of risk is congressional displeasure. I do not think it is the intent of this committee to completely freeze EDA loans.

1968 § 702 Oversight Hearings at 193.

**36.** *See* footnote 20, *supra*.

evolved as the result of the receipt and analysis of new information. We have carefully reviewed the record in connection with the three steel plate projects challenged by Lukens,[37] and have determined that, with the exception of the specialty finishing project, there is a rational basis for EDA's conclusion that they will not result in a significant increase in production prohibited by § 702.

EDA determined that Phoenix could be expected to produce 243,100 tons of steel plate in 1981, the year of projected completion of the project. This was not considered to be a significant increase over the 236,985 tons produced in 1973.[38] Lukens urges that the agency, rather than measuring the expected increase in production in terms of these aggregate figures, should have looked specifically at the projected increases in each individual product line. EDA claims to have looked at the effects of the proposed projects on specific steel products,[39] but argues that the projects must realistically be viewed in terms of aggregate plate production, since the proposed equipment "cuts across product lines".[40] That is, each piece of equipment will be used in the production of several different steel plate products, so it is not possible to measure the increase in production of a specific type of steel plate caused by a specific piece of equipment.[41] With the exception of the specialty finishing project as it relates to stainless steel production (to be discussed in detail, below), we find no error in measuring increased production in terms of aggregate steel plate figures.

We find that EDA's conclusions with respect to the heavy plate and vacuum degassing projects were not arbitrary and capricious. EDA concluded that the heavy plate project and the vacuum degassing project would not enable Phoenix to produce products that were qualitatively different from those it currently produces.[42] As noted above, EDA further concluded that these two projects would not result in a significant increase in aggregate production of steel plate.[43] There is a rational basis in the record for these conclusions. Previously, Phoenix produced heavy steel plates by welding smaller plates together, absorbing the cost of the weld. The new equipment would permit Phoenix to produce heavy plate in a single form, a more efficient process that would reduce the cost of production, but not increase the capacity to produce heavy plate.[44] The Battelle study supports this conclusion:

> The proposed Heavy Plate Program includes installation of new auxiliary equipment for Phoenix Steel's plate rolling shop at Claymont. The program contemplates no change in the rolling mills themselves.

> The Heavy Plate Program will have no impact on the nominal capacity of the Claymont plant for rolling steel plates. In most steel plants the yield of products from the rolling mill is 60 to 80 percent of the raw steel input to the mill. The remainder is considered home scrap and is recycled back through the melting fur-

---

37. Heavy plate, vacuum degassing specialty finishing.

38. VI A.R. 783, EDA has discussed the definition of "significance", See p. 453, supra, but has not set forth in numerical terms what it considers to be the dividing line between significant and insignificant increases. While these were the figures used in EDA's final § 702 opinion, Phoenix' revised projection for 1981 indicates that aggregate production is expected to be 231,604, less than the 1973 figure. XII A.R. 2121.

39. VI A.R. 787–88.

40. VI A.R. 787.

41. EDA and Phoenix also argue that it is not possible to determine the increase in production caused by the new equipment, since the increase in production and sale of each individual product line will be determined by Phoenix' "marketing strategy". VI A.R. 788. We find this to be a weak argument since, without the new equipment which will enable Phoenix to reduce production costs, there is no reason to expect that a new "marketing strategy" would be more successful than the present one.

42. VI A.R. 1088.

43. VI A.R. 784.

44. VI A.R. 1016.

naces. The nominal rolling capacity of 450,000 tons per year is consistent with the nominal melting capacity of the plant of about 600,000 pounds per year. Because the modernization plan involves new supporting equipment and not replacement of basic rolling mill, the nominal capacity of the mill will remain at 450,000 tons per year.[45]

Similarly, Phoenix now has the capacity to produce degassed steel, but by a relatively inefficient method. While the vacuum degassing equipment would provide Phoenix with modern technology capable of producing degassed steel more efficiently, it would not in itself "result in" an increase in production. Again, the Battelle report supports this conclusion.

> Vacuum degassing is a technique that permits a manufacturer of steel to accomplish two main improvements—(1) higher output of steel from a given electric melting furnace, and (2) higher quality in the steel. The vacuum degasser provides the *capability* to accomplish these improvements, but the improvements are not automatic. The operator may elect to use the equipment to accomplish either of the potential improvements (without the other) or to accomplish both of the potential improvements simultaneously to some degree.

> Phoenix plans to use the vacuum degasser primarily to make products of higher quality. However, their plan does call for a small increase in output of steel as measured in tons. The small increase, however, is a result of a planned interaction between their electric-furnace practice and the vacuum degasser. The interaction is market oriented rather than melting oriented. Expressed another way, the planned increase in output *tonnage* does not depend upon the vacuum degasser per se, but could be obtained by

improving the operation of the electric-furnace shop without the degasser.

The Claymont electric furnace shop (without the degasser) has a nominal capacity of about 600,000 tons of liquid steel per year. However, its peak output has been about 340,000 tons annually. If Phoenix wants increased melting and refining capacity, they could get it by means of better and more productive practice at the electric melting furnaces. The vacuum degasser is not vital to Phoenix's steelmaking *capacity as measured in tons*, but is important to Phoenix's ability to produce the higher quality steels economically.[46]

While the decision to provide assistance for the vacuum degassing and heavy plate projects is, therefore, sustainable on the record, we do not find in the existing record an adequate explanation of EDA's reason for its decision to support the specialty finishing project. EDA's decision in this case is embodied in an Action Memorandum [47] which incorporates the agency's findings with respect to § 702.[48] When such a contemporaneous explanation of the agency's decision exists, the propriety of the decision must be judged on that basis.[49] It is not the Court's function to search the record for something which *might* support the agency's decision, if the agency itself has not clearly set forth its reasons. When the reason for the agency's decision is not clear, the Court may require the agency to provide the reason for its decision. *Camp v. Pitts, supra,* 411 U.S. at 142–43, 93 S.Ct. 1241. Since we find it necessary to remand this matter to EDA for further consideration of another issue, discussed below, we will require EDA, on remand, to give further consideration to the specialty finishing project and provide reasons for its decision.

The specialty finishing project will be used in the processing of three steel plate products—carbon and alloy, clad, and stain-

---

**45.** VI A.R. 1023–24.

**46.** VI A.R. 1022.

**47.** VI A.R. 1128.

**48.** VII A.R. 1165; *See* n. 20, *supra.*

**49.** *See Camp v. Pitts, supra,* p. 451.

less.[50] While EDA claims to have looked at the effects of the proposed project on aggregate plate production, the figures it compared for 1973 and 1981 do not include stainless steel plate.[51] Lukens' brief, while referencing the projected increase in stainless conversion in its discussion of all of the individual product lines, does not discuss the omission of stainless from the aggregate total.[52]

Phoenix, in its application materials, suggests that factors other than the new specialty finishing equipment will limit its capacity[53] to convert stainless steel:

Elimination of the carbon and alloy plate heat treatment from our existing furnace *will not* increase the capacity of this furnace with regard to the clad and stainless products. Phoenix has processed about 600 tons of clad and 2500 tons of stainless plate through the furnace per month. This represents our approximate finishing capacity for these products. Routine production is substantially below these figures. Because of our plate finishing limitation, increased tonnages of these products cannot be processed, since it is the finishing limitation, not the furnace limitation, which is the overall capacity barrier. The additional furnace and its related equipment will have no effect on the capacities of either the clad or stainless conversion products.[54]

Battelle Memorial Institute, however, found that the new furnace would increase Phoenix' ability to produce stainless steel:

There is no nominal or published capacity for the finishing operations of the Claymont plant. Rather, there are facility limitations which restrict the practical capacity to the level of the current output of stainless steel and the clad plate—totaling roughly 1000 tons per month (12,000 tons per year).

The new equipment, when installed, will provide facilities and space to eliminate some present limitations and to shift the limiting factors back to the heat treating furnaces. The new equipment and space are expected to increase the company's ability to produce an additional 1200 tons per month of stainless steel sheet (14,400 tons per year) and an additional 300 tons per month of stainless steel clad plate (3600 tons per year). Both of these additions in volume are based on rolling purchased or customer-supplied stainless steel ingots.

Without the project, Phoenix would not be able to participate in the increased market for stainless steel and alloy plates and stainless steel clad plates.

On the other hand, with the project, Phoenix should be able to participate importantly in the market with increased output of specially finished steel products at increased margins.[55]

Battelle later modified this statement to speak in terms of *total* output rather than *increased* output of stainless plate:

The second sentence of that paragraph should be modified. At the time it was

---

**50.** *See* p. 448, *supra.* The specialty finishing project is the only one of the challenged projects involved in stainless steel conversion.

**51.** The aggregate figures which appear at VI A.R. 783 were derived from charts at VI A.R. 901 and XII A.R. 2026. Upon inspection of these charts, it is clear that stainless conversion was not included in the total tonnage figures. The stainless steel conversion tonnage for 1973 was 1,362. XII A.R. 2026. A stainless steel tonnage projection for 1981 is not included in the chart at VI A.R. 901.

**52.** Indeed, Lukens may not consider the competition in stainless plate to be significant, since the record suggests that Lukens accounts for half the market capacity in this product. VI A.R. 943, 948. Nonetheless, it is the obligation

of the Court to review the entire administrative record with care, whether or not the parties have called the Court's attention to apparent discrepancies.

**53.** EDA does not conclude on the record that a determination that there will be no increase in capacity is dispositive of the § 701 question. On the contrary, EDA stated that its final § 702 opinion was based "solely on an estimate of the production effects of the equipment and not on the rated capacity of the Phoenix mills to melt and roll steel." VI A.R. 787.

**54.** VI A.R. 1012.

**55.** VI A.R. 1025.

written the Battelle staff was not aware of the peak output of the special finishing facility at Claymont. We believe now on the basis of additional information that the following sentence appropriately describes the present facility, "Rather, there are facility limitations which restrict the practical output of this section of the plant. Peak output of the special finishing facility in any one month has been 1900 tons of stainless steel plate and 500 tons of clad plate."

With that clarification of the present situation, the second sentence of the second paragraph would have to be modified as follows. "The new equipment and space are expected to allow the company to special finish on a more regular basis stainless steel plate at the rate of about 2000 tons per month and clad plate at about 500 tons per month.[56]

In the five § 702 opinions rendered by EDA, there are only two specific references to stainless steel conversion. In its opinion dated January 19, 1979, EDA states:

2. *Special Finishing Equipment*—although the firm can now heat-treat plates, this equipment, which will modernize the heat treating area, will supplement the existing less efficient equipment. The average throughput of stainless steel plate and stainless clad plate is presently 1,200 tons and 300 tons per month, respectively. This new equipment, which will enhance the plant's ability to process plate at its present rate, will not significantly increase production. Phoenix is not a manufacturer of stainless steel, but converts stainless ingots from other producers into plates.[57]

In its final opinion, which purports to reconcile its four previous opinions, EDA states:

Phoenix has never produced (melted) stainless steel but does (and will) convert stainless steel for other manufacturers and for its own use. (The one exception to this statement would be the ability to meet a highly technical U.S. Navy specification for its nuclear submarine program which the ISD does not believe constitutes a significant new market area for Phoenix.) [58]

In the first of these opinions quoted above, EDA appears to measure stainless steel production against *current* levels. This seems inconsistent with its stated position, discussed above, that increases in production would be measured against 1973 levels. We found, above, that it was within the scope of EDA's authority to measure production increases against total production for a recent peak year. We find nothing in this record, however, stating a reason for EDA's comparison of the increase in stainless steel production on the basis of current levels rather than on the basis of 1973 levels.

Furthermore, the record contains no specific finding by EDA that the increase in stainless steel production to 24,000 tons annually [59] is "insignificant". In addition, as heretofore pointed out, the record is not clear as to whether EDA intended to measure the increase in stainless steel production against current levels rather than the 1973 levels which it opted to use for all of the other products, or whether EDA mistakenly concluded that it had considered the increase in stainless steel production in comparing the aggregate totals of plate products.[60] Because the record is unclear in this respect, this Court is unable to determine

---

**56.** VI A.R. 1030. Battelle does not explain why the modified statement, prepared one day after the original, changes the monthly peak figure from 1,000 tons of stainless plate to 1,900. Yet another monthly peak figure (2,500 tons) appears in Phoenix' submission at VI A.R. 1012.

**57.** VI A.R. 1033.

**58.** VI A.R. 788. Statements such as these, which indicate that Phoenix is not a manufacturer of stainless steel, might seem to suggest that EDA does not consider stainless plate to

be a "product" within the purview of § 702. This is not a conclusion which EDA has explicitly drawn on the record, however. Nor would it seem to be a reasonable conclusion, since the effects of increased capacity to convert stainless steel would be relevant to other firms engaged in stainless steel conversion.

**59.** *See* n. 56, *supra.*

**60.** *See* p. 456, and n. 51, *supra.*

whether EDA's actions, findings, and conclusions concerning the increase in stainless steel production expected to result from the specialty finishing project are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; we will therefore remand this matter to EDA for findings and reasons to support its conclusion that the specialty finishing project will not result in a significant increase in production of stainless steel.

### B. Equity Contribution

■ We now review the record to determine to what extent Phoenix is required to support its leveraged lease guarantee application with its own financial resources, and to determine whether those requirements have been satisfied. The Act itself requires a 15% equity capital contribution for loan assistance, but makes no mention of lease guarantee assistance.[61] However, the Secretary has, under the Act, broad power to implement its provisions through such regulations as [s]he deems appropriate.[62] In connection with equity capital requirements, the Secretary has promulgated the following regulations, at 13 CFR § 306.14:

§ 306.14 Equity capital requirements

The Act require a minimum equity contribution only for direct fixed asset loan projects. However, all projects should be supported by equity capital to the following extent:

\* \* \* \* \* \*

(d) In EDA lease or lease-purchase guaranty projects, the applicant should have expended an amount equal to not less than 15 percent of the value of the assets to be leased. Such expenditures shall be for either leasehold improve-

ments or the types of fixed assets which can be allowable project costs under § 306.12. If applicant is not paying for needed leasehold improvements or fixed assets, its working capital should be augmented instead. Cash for the expenditures required by this subsection shall be obtained by applicant either from equity capital or a standby loan.

It is well established that federal agencies are bound by their own regulations. *United States v. Nixon,* 418 U.S. 683, 695–96, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Yellin v. United States,* 374 U.S. 109, 121, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963); *Service v. Dulles,* 354 U.S. 363, 380, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1957) (1954). As recently stated by the D.C. Circuit in *Vander Molen v. Stetson,* 187 U.S.App.D.C. 183, 190, 571 F.2d 617, 624 (D.C.Cir. 1977):

It is, of course, a fundamental tenet of our legal system that the Government must follow its own regulations. Actions by an agency of the Executive Branch in violation of its own regulations are illegal and void.

EDA Now argues that § 306.14 uses the word "should", and is therefore merely precatory and not mandatory.[63] However, in its consideration of the Phoenix application, EDA determined that 15% participation would be required in this case.[64] EDA found the 15% equity capital requirement to have been satisfied by the conversion of a $7.5 million (erroneously identified in the record as $755 million) note to equity capital.[65] The final Action Memorandum states that this conversion of debt into equity took

---

**61.** 42 U.S.C. § 3142(b)(9) provides in pertinent part:

(9) Loan assistance . . . shall . . . be on the condition that—

(B) not less than 15 per centum of such aggregate cost be supplied as equity capital or as a loan . . .

**62.** 42 U.S.C. § 3211(12).

**63.** Whether the language of a statute or regulations is "may", "must", or "should" is not

automatically determinative of whether the statute or regulation is mandatory or precatory. *Doe v. Hampton,* 184 U.S.App.D.C. 373, 566 F.2d 265 (D.C.Cir. 1977).

**64.** VII A.R. 1140.

**65.** The note represents funds borrowed by Phoenix from Creusot-Loire, a French steel company which owns a controlling interest in Phoenix. VI A.R. 1133.

place on June 30, 1978.[66] This finding is unsupported by the record. The only evidence in this record concerning the date of this transaction states that the loan from Creusot-Loire to Phoenix was made in February, 1978, before the Steel Loan Program was formally announced, and that the note was converted into stock on April 18, 1978, the date the Steel Loan Program guidelines were published in the Federal Register.[67]

Phoenix and EDA argue in their briefs that such a prior transaction would be sufficient to meet the requirements of the regulations. Indeed, this may be so, since 13 CFR § 306.14(d) states that "an applicant *should have* expended an amount equal to not less than 15 percent of the value of the assets to be leased." (emphasis added). We cannot, however, accept such subsequent rationalizations [68] of the agency's decision. We find that the memorandum prepared by the agency officials who recommended approval of the application was arbitrary and capricious in that it concludes that the leveraged lease was supported by 15% equity capital acquired after the application to EDA was filed. The record demonstrates that the Creusot-Loire note was converted to stock before Phoenix applied for EDA assistance, and may have no relevance to the projects for which Phoenix seeks EDA assistance. We, therefore, remand to the agency for a further consideration of whether the 15% equity requirement which EDA found applicable to the lease

guarantee in this case has in fact been satisfied.

## C. Other Requirements

In addition to the § 702 and equity capital requirements, EDA was required to review Phoenix' application to determine whether the proposed projects were technologically acceptable,[69] whether private financial assistance was unavailable,[70] and whether there is a reasonable assurance of repayment.[71] Lukens no longer seriously challenges these issues, but, since the complaint has not been formally amended, we have reviewed the record, as summarized in the Final Action Memorandum, finding the agency's actions, findings and conclusions in connection with technological requirements, lack of private support, and likelihood of repayment, not to be arbitrary or capricious.

## VI. Summary

For the reasons set forth above, the Court finds that EDA acted within the scope of its authority in offering the challenged assistance to Phoenix. The Court finds, however, that EDA's actions, findings and conclusions, in connection with the equity contribution requirement, are arbitrary and capricious. The Court further finds that this record is deficient in that it contains no specific finding by EDA that the

---

**66.** VII A.R. 1140. This is not merely a typographical error, since the record states, "On June 30, 1978, after applying for EDA financial assistance . . ."

**67.** The record states the following concerning the loan:

> During February 1978, the Company borrowed $7,500,000 from Creusot-Loire on a short-term, unsecured basis with interest payable at prime plus one %. The Company's Board of Directors authorized the issuance of 1,018,182 shares of common stock at $2.75 per share ($2,800,000) and 94,000 shares of a new series of convertible preferred stock at $50 per share ($4,700,000) to Creusot-Loire in exchange for the $7,500,000 note payable . . . .. *The stock is to be issued after action by the American Stock Exchange on the Company's listing application covering such stock.*

III A.R. 460.
The record further states in reference to the conversion of debt to equity:

> On April 18, 1978, the Company issued 1,018,182 shares of common stock at $2.75 per share ($2,800,000) and 94,000 shares of Series B convertible preferred stock at $50 per share ($4,700,000) to Creusot-Loire in exchange for a $7,500,000 note payable.

X A.R. 1660.

**68.** *See Overton Park, supra,* 401 U.S. at 419, 91 S.Ct. 814.

**69.** Steel Program Guidelines, pp. 447–448, *supra.*

**70.** 42 U.S.C. § 3142(b)(4).

**71.** 42 U.S.C. § 3142(b)(6).

specialty finishing project will not result in a significant increase in production of stainless steel.

An appropriate Order will be entered in accordance with this Memorandum.