**LUKENS STEEL COMPANY**

v.

**Juanita M. KREPS, Secretary of Commerce, Robert T. Hall, Assistant Secretary of Commerce, and Phoenix Steel Corporation.**

Civ. A. No. 79–1053.

United States District Court,
E. D. Pennsylvania.

Jan. 7, 1980.

Development Administration (EDA) to guarantee ninety percent (or $29,039,400) of the rental obligation to be incurred by Phoenix Steel Corporation (Phoenix) under a proposed "leveraged lease" of capital equipment to be used in the modernization of its steel plate production facilities.[1] The EDA extended its offer of assistance to Phoenix pursuant to the Public Works and Economic Development Act (the Act), 42 U.S.C. § 3211 *et seq.* and regulations promulgated under the Act for a program of assistance to the steel industry, 43 Fed.Reg. 16360 (April 18, 1978). Lukens contends that the EDA's approval of the lease guarantee was unlawful in that the EDA:

(1) violated the unfair competition provision of the Act, § 702 (42 U.S.C. § 3212);

(2) violated the 15% contribution provision of EDA's regulations, 13 CFR § 306.14;

(3) erroneously concluded that Phoenix does not have access to normal markets and cannot generate needed funds internally; and

(4) erroneously concluded that Phoenix can reasonably be expected to repay the loan.

Robert M. Landis, Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

Stanley D. Wright, U. S. Dept. of Justice, Washington, D. C., Robert C. Fastov, Economic Development Adm'n, U. S. Dept. of Justice, Washington, D. C., for Federal defendants.

Robert S. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for Phoenix Steel.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

## I. *INTRODUCTION*

Plaintiff, Lukens Steel Company (Lukens), has sought review under § 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–6, of the decision of the Economic

This matter was previously before Judge Broderick on cross-motions for summary judgment. He denied the motions, remanding the matter for further consideration by the EDA. *Lukens v. Kreps,* 477 F.Supp. 444 (E.D.Pa.1979). Judge Broderick undertook a two-phase analysis of the EDA's action, first considering the EDA's interpretation of the unfair competition provision of the Act, § 702, and then reviewing the administrative record to determine whether the agency's actions, findings, and conclusions in connection with the challenged assistance to Phoenix were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 477 F.Supp. at 450–51.

Section 702 of the Act provides

---

1. A detailed description of the proposed project is set forth in the court's prior opinion. *Lukens v. Kreps,* 477 F.Supp. 444, 446–49 (E.D.Pa. 1979).

No financial assistance under this chapter shall be extended to any project when the result would be to increase the production of goods, materials, or commodities, or the availability of services or facilities, when there is not sufficient demand for such goods, materials, commodities, services, or facilities, to employ the efficient capacity of existing competitive commercial or industrial enterprises.

The EDA considers the requirements of § 702 to be met if proposed financial assistance will not result in an increase in aggregate steel production when measured against an historical peak production year. Judge Broderick found this interpretation of § 702 to be a reasonable one. 477 F.Supp. at 451–56.

He went on to review the administrative record to determine whether the EDA's offer of assistance to Phoenix was arbitrary and capricious according to the test defined in *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) and *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The EDA's actions were found not to be arbitrary and capricious, with two exceptions. The court remanded the matter to the EDA for further consideration of these two issues—the fifteen percent equity contribution requirement, and the effect of one of the components of the project (specialty finishing equipment) on the production of stainless steel. The EDA reconsidered these two issues, and reaffirmed its decision to guarantee ninety percent of the rental cost to be incurred by Phoenix.

Phoenix and the federal defendants have placed the new administrative record before us and seek summary judgment affirming the agency's decision. Lukens has filed a cross-motion for summary judgment raising, in addition to the equity contribution and stainless steel issues, the new argument that Phoenix may not receive federal assistance for the vacuum degassing equipment because the project has been completed with other funds. For the reasons discussed below, we will grant summary judg-

ment for Phoenix and the federal defendants.

## II. STANDARD OF REVIEW

Lukens has argued that the agency's actions on remand are "post hoc rationalizations" which the court must "view critically". This argument misconstrues *Overton Park, supra*, 401 U.S. at 420, 91 S.Ct. 814. In that case the Supreme Court ordered the matter remanded because, among other things, the agency had not rendered any explanation of its decision. Among the possible courses of action the Court outlined was the furnishing of such an explanation by the administrator. The question upon which the Court commented was the weight to be given an administrator's *non-contemporaneous* explanation of action he had taken earlier, not the weight to be accorded a contemporaneous decision actually made on remand, when an agency undertakes to reconsider substantive issues. The circumstances of this case, however, are significantly different. Here, pursuant to the Court's remand order, the EDA undertook to consider the two remanded issues, and to do so in part on the basis of facts not before it earlier. The resulting agency determinations, embodied in new action memoranda (XVII A.R. 2923–33, 2976–86),[2] are not "post hoc rationalizations" at all, but explanations of the agency's reasoning prepared contemporaneously with the EDA's determinations on remand. As such, they are subject to the "arbitrary and capricious" and "rational basis" principles discussed at length in the Court's earlier opinion. 477 F.Supp. at 450–51.

## III. EQUITY CONTRIBUTION

While the Act is silent as to equity contribution requirements on the part of applicants for lease guarantee assistance, EDA's regulations, at 13 CFR § 306.14, provide:

§ 306.14 Equity capital requirements.

The Act requires a minimum equity contribution only for direct fixed asset loan projects. However, all projects

2. Citations to the administrative record refer to volume and page number.

should be supported by equity capital to the following extent:

  \*     \*     \*     \*     \*     \*

(d) In EDA lease or lease-purchase guaranty projects, the applicant should have expended an amount equal to not less than 15 percent of the value of the assets to be leased. Such expenditures shall be for either leasehold improvements or the types of fixed assets which can be allowable project costs under § 306.12. If applicant is not paying for needed leasehold improvements or fixed assets, its working capital should be augmented instead. Cash for the expenditures required by this subsection shall be obtained by applicant either from equity capital or a standby loan.

The EDA originally determined that a 15% contribution of equity capital was applicable to the Phoenix project and found it to have been satisfied by an augmentation of equity capital provided by the conversion to equity of a $7.5 million debt owed by Phoenix to Creusot-Loire, a French steel company which owns a controlling interest in Phoenix. The EDA initially concluded that "On June 30, 1978, after applying for EDA assistance, Phoenix augmented its working capital by $755 million [sic] . . . ." (VII A.R. 1140). Judge Broderick found this conclusion to be unsupported by the record, since the record demonstrated that this transaction was actually completed before Phoenix applied for EDA assistance. He therefore remanded the matter to the EDA for further consideration as to whether a transaction consummated before the submission of the application for assistance might satisfy the 15 percent equity contribution requirement. 477 F.Supp. at 461–62.

On remand, the EDA clarified its interpretation of § 306.14 as follows:

Specifically, the language [of § 306.14] "should be supported" and "should be augmented" indicates that this regulation is not mandatory, but merely evidences a policy that EDA-assisted entreprises [sic] generally should not be purely government-funded, but should also in appropriate cases manifest involvement or com-

mitments of private equity investors or commercial lenders which are reasonably related in time and effect to the EDA-assisted project. The commitment of these outside parties can contribute to the viability of the enterprise, in general, and the project in particular.

(XVII A.R. at 2926–27). The EDA regards the requirements of § 306.14 to be satisfied by a contribution to the overall modernization project; a direct expenditure for the leased equipment is not required. Furthermore, the agency does not regard the timing of the contribution to be crucial, so long as it is related to the modernization program:

The precise date of the transaction is not crucial, however . . . so long as it is reasonably related to the EDA assistance. . . . The regulation and the Guidelines do not suggest the parameters [sic] of any proximity test. In this case, it is reasonably clear that the Creusot-Loire $7.5 million infusion was closely related to the Phoenix modernization program, of which the EDA-assisted projects constitute a significant portion.

(XVII A.R. 2929).

The EDA therefore concluded that the $7.5 million Creusot-Loire contribution was an augmentation of working capital satisfying § 306.14:

This chronology illustrates that the infusion of the $7.5 million, the conversion process and application process proceeded simultaneously, and that a focus on a particular date, which is not required by any regulation, would be misleading and contribute nothing to any private-commitment policy. The $7.5 million Creusot-Loire infusion clearly constituted an augmentation of Phoenix's working capital. The original 506 is thus confusing in mentioning the date June 30, 1978 with no explanation, but the substance of the transaction more fully amplified herein, fully satisfies the requirements of the regulation as applied to this case. The Creusot-Loire infusion thus fully satisfies the *letter* of § 306.14 of the Regulations

and Guidelines, as well as the EDA policy behind them.

(XVII A.R. 2931).

▮ Lukens does not dispute that the $7.5 million Creusot-Loire transaction was an augmentation of working capital. It argues, however, that the timing of the transaction establishes that it bore no relation to the Phoenix modernization project, since the $7.5 million addition to working capital was dissipated by March, 1979 when EDA approved the lease guarantee. It is apparent that Lukens is urging an interpretation of § 306.14 which differs from that set forth by the EDA on remand. Even if Lukens' suggested interpretation is a reasonable one, we may not substitute it for a reasonable interpretation by the agency. *Budd Co. v. Occupational Safety & Health Rev. Com'n.*, 513 F.2d 201, 204–05 (3d Cir. 1975). While there may also be other reasonable interpretations, we find the EDA's interpretation of § 306.14 to be reasonable. Upon review of the administrative record, we find a rational basis for the EDA's determination that § 306.14 was satisfied by the $7.5 million augmentation of working capital resulting from the Creusot-Loire transaction.

## IV. STAINLESS STEEL

▮ In its previous opinion, the court approved EDA's use of aggregate steel production figures in determining whether the equipment to be leased would bring about an increase in production prohibited by § 702 of the Act. 477 F.Supp. at 457. A rational basis was found in the record for the EDA's conclusion that the heavy plate and vacuum degassing projects would not result in a significant increase in aggregate production of steel plate. 477 F.Supp. at 457. The court did not find adequate support in the record, however, for the EDA's decision to support the special finishing project, since the agency had not given appropriate consideration to the project's effect on the conversion of stainless steel.[3] 477 F.Supp. at 460.

On remand, the EDA re-evaluated production figures and concluded that the proposed equipment will not result in a significant increase in aggregate steel plate production, including stainless steel conversion:

As the March 16, 1979 opinion more fully sets out, the year 1973 represents the recent historic peak production year of Phoenix, for all plate productions, and 1981 is the year in which EDA financed equipment is projected to be in place. A comparison of total output (conversion and plate production) for 1973 and 1981 shows a 15,257 ton or six percent increase in total projected 1981 Phoenix output of plate, including conversion, over the historic peak output year of 1973. The time comparison is the same one made in the ISD final March 16, 1979 Section 702 opinion on Phoenix and clearly shows that, assuming the increase is causally related to the EDA projects, EDA financial assistance "will not result in a significant increase in production or services that have heretofore been available in the area, because its purpose is to assure the retention of existing capacity and employment." (footnotes omitted).

(XVII A.R. at 2880–81). The increase in stainless steel conversion, measured separately against current production levels, was also found to be insignificant:

Phoenix is currently converting stainless steel—without EDA assistance and utilizing its existing capacity—in quantities similar (on an estimated annualized basis) to those it projects for 1981. The projected 3337 ton increase (1979 compared with 1981) in conversion tonnage would have little or no measurable effect on competitors given the size of the stainless steel market of approximately 115,000 tons annually for the 1979–81 period and the nature of the competitors. Moreover, the fact that 1973 was not Phoenix's peak stainless conversion year underlines the necessity of analyzing only aggregate

---

3. Phoenix does not melt stainless steel but rolls stainless steel plate from ingots supplied by customers. *See* 477 F.Supp. at 448 n. 15.

output figures, for, as the figures below indicate, Phoenix did relatively little stainless conversion at all until 1977 or 1978. This is obviously a function of Phoenix-determined product mix alone rather than any capacity-related production constraints, since the necessary specialty finishing equipment was in place and was and is being used on Phoenix's own plate products, as well as stainless conversion.

(XVII A.R. 2879–80).

On the basis of a review of the original record and the record on remand, we find a rational basis for the EDA's conclusion that the special finishing project will not result in significant increase in the production of stainless steel.

Lukens again raises the argument that, because the special finishing project will add a new furnace that will operate along with existing equipment, it must necessarily result in increased productive capacity. We find no reason to reconsider Judge Broderick's conclusion that, because special finishing capacity is limited by factors other than the furnace, there is a rational basis for the agency's determination that the special finishing project does not violate § 702 of the Act. *See* 477 F.Supp. at 444.

## V. *AVAILABILITY OF SUPPORT FOR THE VACUUM DEGASSING PROJECT*

Section 202(b)(4) of the Act, 42 U.S.C. § 3142(b)(4) requires that an applicant be unable to obtain private financial support in order to qualify for EDA assistance. The court concluded that the original administrative record provided a rational basis for the EDA's conclusion that this requirement has been satisfied. 477 F.Supp. at 462. Lukens now seeks reconsideration of this finding on the basis of what it considers to be new information that Phoenix has completed the vacuum degassing project without EDA assistance. Phoenix concedes that it has expended working capital to complete this part of the overall project. (Phoenix' Memorandum in Opposition to Lukens' Renewed Motion for Summary Judgment at 25). ·

We find no basis for reconsideration of the conclusion that there was a rational basis for the EDA's determination that other financing was unavailable for Phoenix' modernization program. Phoenix's 1978 Annual Report, which was published on April 6, 1979, disclosed that the vacuum degassing project was under construction. *See* XVII A.R. 3128. The EDA was aware before March 19, 1979, when it approved the loan guarantee, that Phoenix anticipated completion of the vacuum degasser in 1979. XVII A.R. 2924–25. The fact that Phoenix used working capital as interim financing for the vacuum degassing equipment does not compel the conclusion that there is no rational basis for the EDA's determination that private financing was not available for Phoenix' modernization program.

## VI. *CONCLUSION*

For all of the above reasons, we grant defendants' motions for summary judgment, and deny plaintiff's motion for summary judgment.