Alejandro **RAVANCHO** and Zenaida Ravancho, Petitioners,

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 79–2646.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Aug. 5, 1980.

Reheard Before Original Panel June 8, 1981.

Decided Aug. 26, 1981.

---

Martin L. Rothstein (argued), Barst & Mukamal, New York City, for petitioners; Ronald J. Fleury, Brooklyn, N. Y., of counsel on the brief.

Allen W. Hausman (argued), James P. Morris, Gen. Litigation and Legal Advice Section, Crim. Div., James A. Hunolt, Dept. of Justice, Washington, D. C., for respondent.

Before ALDISERT and SLOVITER, Circuit Judges, and HANNUM, District Judge.*

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

This case is before us on rehearing before the original panel following our exercise of our discretionary authority to recall the certified judgment issued in lieu of mandate, an action which we take only in "unusual circumstances." *American Iron and Steel Institute v. EPA*, 560 F.2d 589 (3d Cir. 1977), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978). We followed that practice in this case so that we could consider the contention of respondent Immigration and Naturalization Service that our original decision is contrary to the subsequent decision of the Supreme Court in *INS v. Wang*, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981). On consideration of the parties' additional briefs and oral arguments, we believe that the primary basis for our original decision, that the Board abused its discretion in refusing to reopen the record to consider psychiatric data not available during previous hearings, is not foreclosed or undermined by the *Wang* decision, and we once again conclude a remand to the Board of Immigration Appeals is appropriate.

Zenaida Ravancho and her husband, Alejandro Ravancho, are both citizens of the Philippines who entered the United States on November 7, 1968 and December 19,

* Hon. John B. Hannum, United States District Court Judge for the Eastern District of Pennsylvania, sitting by designation.

1968 respectively. On December 10, 1969, their daughter Patricia was born in the United States. Zenaida and Alejandro Ravancho were authorized to remain in the United States until February 7, 1974, but remained beyond their authorized stay and were charged with being deportable under 8 U.S.C. § 1251(a)(2) (1976). At the hearings before the immigration judge on February 1, 1978 and on March 15, 1978, the Ravanchos conceded deportability and sought to establish that deportation should be suspended on the ground of "extreme hardship" as provided for in 8 U.S.C. § 1254(a)(1) (1976).[1]

The Ravanchos proved, inter alia, that they are both presently employed; that they have had stable employment records, Mr. Ravancho having been employed as an engineering aide by the Wallace & Tiernan Company of Belleville, New Jersey, since December 1969, and Mrs. Ravancho having been employed by the New Jersey Bell Telephone Company as a keypunch operator since 1970; and that they have purchased a house in New Jersey. They sought to show economic hardship to them which would ensue if they were deported. They also sought to establish hardship to their child (then 8 years old) by their testimony at the hearing on March 15, 1978 that she knows no other life than that in the United States, is unable to speak the Philippine language, was a straight A student in school, and that her "life would be dramatically upset by being uprooted from her home, friends, and the only life she knows."

On October 24, 1978, the immigration judge denied the Ravanchos' applications for suspension of deportation. The judge concluded that the Ravanchos met the physical presence and good moral character requirements for relief under that statute, but had failed to satisfy their statutory burden of showing that extreme hardship would result. He stated:

A careful review of all the facts as presented including the difficulties the respondents would have in attempting to obtain employment in their native Philippines, their family situation, the loss of the income that they have now in the United States and *the possible transfer of their United States citizen child to relocate in the Philippines* does not appear to satisfy the burden placed upon them to show that they would suffer extreme hardship under this Section of the law. *Such economic disadvantage* does not constitute the required statutory hardship. (emphasis added).

The Ravanchos' appeal to the Board of Immigration Appeals was dismissed on June 14, 1979. The Board held that the immigration judge properly found that the economic detriment the Ravanchos might suffer if deported to the Philippines would not amount to extreme hardship within the purview of the statute. The Board further stated in affirming the decision of the immigration judge: "We also find that their United States citizen child, born less than one year after her mother's arrival in this country as a nonimmigrant visitor, would not suffer extreme hardship."[2] The Ra-

---

1. Section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1), provides in part:

   Suspension of deportation

   (a) Adjustment of status for permanent residence; . . . As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who applies to the Attorney General for suspension of deportation and—

   (1) is deportable under any law of the United States except the provisions specified in paragraph (2) of this subsection; has been physically present in the United States for a continuous period of not less than seven

years immediately preceding the date of such application, and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence . . . .

2. According to the record before us, the Ravanchos' daughter was born more than a year after her mother's arrival in the United States. Furthermore, the date of the child's birth more than ten years ago is patently unrelated to her current hardship.

vanchos filed a Motion to Stay Deportation and to Reopen Proceedings on July 31, 1979.[3] They attached to that motion a psychiatric evaluation of Patricia dated July 17, 1979, which had been made to evaluate the effect on Patricia's mental, physical and emotional stability of a return to the Philippines. They also filed an affidavit where they averred, as they had previously testified, that Mrs. Ravancho had a brother and sister who are both lawful permanent residents of the United States and that Mr. Ravancho has a sister who is also a lawful permanent resident of the United States.

■ The Board appeared to treat the petition as one for reconsideration rather than reopening. Although it did not at any time state that the evidence presented failed to meet the requirements of the regulation which limits reopening to cases where the evidence sought to be offered is material and was unavailable at the time of the former hearing, 8 C.F.R. § 3.2, it failed to rule directly on the request for reopening. Instead it denied reconsideration on the ground that the psychiatrist's report did not demonstrate the "extreme hardship" required by the statute. It was that denial which was the subject of the petition for review before this court.[4]

In our original decision, we held that a remand to the Board was appropriate because the Board

appears to have considered the proffered psychiatrist's report in isolation, only in terms of whether, on its own, that report sufficed to demonstrate extreme hardship within the statutory terms. This is contrary to the requirement that the decision whether to suspend deportation must be made on a consideration of *all* relevant factors. The psychiatrist's report may well have been the increment which

would have tipped the balance toward suspension. There is no indication in the Board's opinion that it evaluated the proffered evidence on this basis.

We also stated that the Board appeared to give too little weight to the psychological burden on Patricia, a factor that the immigration judge had erroneously subsumed in his discussion of "economic disadvantage". We concluded our observations with the statements:

We recognize that the determination of whether petitioners have shown extreme hardship to warrant suspension of deportation is entrusted to the discretion of the immigration judge and Board, in the first instance. However, we hold that petitioners have produced evidence which, on its face, is relevant to that determination and which must be considered by the agency in the exercise of its discretion. (footnote omitted).

The thrust of the respondent's position on rehearing is that "[t]he decision in this case is incorrect because this court substituted its own judgment for that of the Board of Immigration Appeals in determining what will constitute extreme hardship warranting suspension of deportation," Respondent's Brief on Rehearing, p. 7, and thus is contrary to *I.N.S. v. Wang*, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981), decided after this court's original decision. Therefore our inquiry must focus upon the Supreme Court's *Wang* decision to determine whether it requires us to reverse our previous disposition remanding this matter to the Board.

Before undertaking that analysis, we feel compelled to comment upon one aspect of the dissenting opinion. As we noted in our recitation of the facts, the immigration

---

**3.** Applications to reopen proceedings after the entry of the deportation order are usually required to be filed before the immigration judge. 8 C.F.R. § 242.22 (1981). If the order has already been appealed, jurisdiction lies with the Board of Immigration Appeals to rule upon the motion to reopen. 8 C.F.R. § 3.2 (1981).

**4.** This court has jurisdiction to review a denial of a motion to reopen proceedings before the

Board of Immigration Appeals pursuant to 8 U.S.C. § 1105a. *Giova v. Rosenberg*, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964), rev'g 308 F.2d 347 (9th Cir. 1962); *Bufalino v. INS*, 473 F.2d 728, 730 (3d Cir.), cert. denied, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973). In such a case, our scope of review is limited to whether the Board abused its discretion. *Jacobe v. INS*, 578 F.2d 42, 45 (3d Cir. 1978).

judge found that the Ravanchos established that they met "the good moral requirements of the statute", a finding the government has not challenged before us. Notwithstanding that finding, the dissenting judge has chosen to rehash the same facts which were before the immigration judge, whose ultimate finding as to the Ravanchos' good character reflects his acceptance of their explanation. It is therefore regrettable that the dissenting judge has chosen to castigate petitioners with no criminal record at all for "their sordid past conduct" and "deceptive conduct"[5] and, perhaps worst of all, invites the Board to take note of conduct which its own immigration judge found did not reflect adversely upon the Ravanchos.

We turn to the consideration of the *Wang* decision. The *Wang* case involved denial by the Board of a second petition to reopen filed by the petitioners, aliens who had overstayed their authorization. The Wangs had originally been unsuccessful in seeking adjustment of status under § 245 of the Act, and then filed the second motion to reopen their deportation proceedings, this time seeking suspension under § 244 of the Act. Their motion alleged that deportation would cause both economic harm to themselves and "extreme hardship to respondents' two American-born children because neither child spoke Korean and would thus lose 'educational opportunities' if forced to leave this country." *INS v. Wang*, 101 S.Ct. at 1030. The Board found the Wangs had failed to present a prima facie case warranting reopening and denied their motion without a hearing. The Court of Appeals for the Ninth Circuit reversed, finding that the Wangs had alleged a sufficient prima facie case of extreme hardship to entitle them to a hearing.

In reversing the Ninth Circuit, the Supreme Court stated:

The Court of Appeals erred in two respects. First, the court ignored the regulation which requires the alien seeking suspension to allege and support by affidavit or other evidentiary material the particular facts claimed to constitute extreme hardship. Here, the allegations of hardship were in the main conclusory and unsupported by affidavit. By requiring a hearing on such a motion, the Court of Appeals circumvented this aspect of the regulation, which was obviously designed to permit the Board to select for hearing only those motions reliably indicating the specific recent events that would render deportation a matter of extreme hardship for the alien or his children.

Secondly, and more fundamentally, the Court of Appeals improvidently encroached on the authority which the Act confers on the Attorney General and his delegates. The crucial question in this case is what constitutes "extreme hardship." These words are not self-explanatory, and reasonable men could easily differ as to their construction. But the Act commits their definition in the first instance to the Attorney General and his delegates, and their construction and application of this standard should not be overturned by a reviewing court simply because it may prefer another interpretation of the statute. Here, the Board considered the facts alleged and found that neither respondents nor their children would suffer extreme hardship. The Board considered it well-settled that a mere showing of economic detriment was insufficient to satisfy the requirements of § 244 and in any event noted that respondents had significant financial resources while finding nothing to suggest that Mr.

---

**5.** All persons who have overstayed their visa, and therefore seek suspension of deportation under 8 U.S.C. § 1254(a)(1), as well as those who have entered illegally, have by one act or other "deceived" our administrative officials. In recognition that such "deception" represents merely an avid and irrepressible desire to remain and live in this country, Congress has enacted the statute in question, the former

Chief Executive has granted entry to more than 125,000 illegal entrants, *see*, Pres. Determination No. 80–16, 45 Fed.Reg. 28,079 (1980) (Cuban refugees), and the present administration has proposed a plan which would grant amnesty for many illegal aliens in this country before January 1, 1980. *See* Immigration Plan Includes Amnesty, Tighter Controls, Wash. Post, July 31, 1981, at 1.

Wang could not find suitable employment in Korea. It also followed that respondents' two children would not suffer serious economic deprivation if they returned to Korea. Finally, the Board could not believe that the two "young children of affluent, educated parents" would be subject to such educational deprivations in Korea as to amount to extreme hardship. In making these determinations, the Board was acting within its authority. As we see it, nothing in the allegations indicated that this is a particularly unusual case requiring the Board to reopen the deportation proceedings.

The Court of Appeals nevertheless ruled that the hardship requirement of § 244 is satisfied if an alien produces sufficient evidence to suggest that the "hardship from deportation would be different and more severe than that suffered by the ordinary alien who is deported." *Wang v. INS, supra*, 622 F.2d [1341] at 1346 [(9th Cir.)]. Also, as Judge Goodwin observed in dissent, the majority of the Court of Appeals also strongly indicated that respondents should prevail under such an understanding of the statute. *Id.*, at 1352. In taking this course, the Court of Appeals extended its "writ beyond its proper scope and deprived the Attorney General of a substantial portion of the discretion which § 244(a) vests in him." *Id.*, at 1351 (Sneed, J., ·dissenting from the opinion).

*Id.* at 1030–31 (footnotes omitted).

The Court noted that the Attorney General and his delegates have the authority to construe the statutory standard of "extreme hardship" narrowly should they deem it wise to do so. The Court also noted that the standard established by the Ninth Circuit, by mandating a hearing upon "quite minimal showings", was contrary to the Government's "legitimate interest in creating official procedures for handling motions

to reopen deportation proceedings so as readily to identify those cases raising new and meritorious considerations." *Id.* at 1031.

We perceive substantial differences between the *Wang* case and that at issue here. In the first place, this case does not suffer from the first factor stressed by the Supreme Court, the failure of the Wangs to allege and support by affidavit or other evidentiary material "the particular facts claimed to constitute extreme hardship." On the contrary, in this case the Ravanchos filed the necessary affidavit and proffered as evidentiary material the psychiatric evaluation which related to "the particular facts claimed to constitute extreme hardship." Unlike the Wangs who apparently proffered merely a conclusory allegation about a general loss of educational opportunities for their children in Korea, the Ravanchos proffered specific evidence relating to a particular child.

We turn then to the more fundamental question of whether a decision by this court to remand constitutes an encroachment on the authority conferred by the Act on the Attorney General. The respondent views our original decision to remand as based on our observations with respect to the Board's construction of "extreme hardship". As shown by the previously quoted excerpts from our prior opinion, however, the primary basis for our original decision to remand was the failure of the Board to consider the newly proffered evidence in conjunction with that previously submitted in order to determine whether the circumstances justified exercise of the Board's discretion. It is not necessary to speculate whether our previous observations about the Board's narrow construction of "extreme hardship", which appeared to us to be inconsistent with Congressional intent,[6] would withstand scrutiny

**6.** A 1957 House Report refers to the Congressional intent "to provide for liberal treatment of children." *See* H.R.Rep.No.1199, 85th Cong., 1st Sess. 7, *reprinted in* [1957] U.S.Code Cong. & Ad.News, 2016, 2020. In view of the grounds of our disposition of this case, we need

not decide whether the effect of the *Wang* decision is to preclude all appellate consideration of the Board's determination whether a particular petitioner has demonstrated the requisite "extreme hardship." *See generally Brathwaite v. INS*, 633 F.2d 657, 659–60 (2d

following the *Wang* decision, since our order granting rehearing withdrew the original opinion. In any event, as petitioners correctly note, those comments were not the ground on which we determined remand was appropriate. Instead, our decision then and now turns on the Board's action, when presented with material evidence previously unavailable, in considering such evidence in isolation in determining whether a prima facie case for reopening was established.

In this respect, this case differs markedly from *Wang* where there was no contention that the Board failed to consider the totality of all of the evidence presented before it. There, the only issue was the substantive evaluation to be given such evidence. The opinion of the Board in this case expressly indicates that reconsideration was denied only on the basis of an analysis of the newly proffered evidence. We express no view on the procedure to be followed by the Board where the petition merely seeks reconsideration based on rearguments with regard to evidence previously submitted. But where, as in this case, petitioners seek to reopen proceedings based on evidence which on its face showed it was not previously available,[7] then we believe the Board abused its discretion in failing to consider the cumulative effect of that evidence. In fact, at the oral argument before us, counsel for the respondent stated that it was the Board's position that in deciding whether there is a prima facie basis for reopening, the Board must consider all of the evidence, not merely the newly proffered evidence. Although counsel also suggested that we should conclude that the Board in fact followed that procedure, it is conceded that there is nothing in the Board's short statement that indicates that anything other than the newly proffered evidence was considered. The Board, after referring to the psychiatric report, stated "*This* is not the type of extreme hardship necessary for a grant of

suspension of deportation and, accordingly, we will deny the respondents' request for reconsideration." (emphasis added). We must make our decision based on the Board's own articulation of its actions, rather than on the assumption of or reconstruction by its counsel.

Although respondent argues that the psychiatric evaluation does not demonstrate "severe hardship", we do not understand it to dispute the general proposition that psychological trauma may be a relevant factor in determining whether a United States citizen child will suffer "extreme hardship" within the statute. Thus, had this or any other relevant factor been disregarded by the immigration judge or the Board when the original determination was made, such action would constitute an abuse of discretion. *See, e. g., Lukens Steel Co. v. Klutznick*, 629 F.2d 881 (3d Cir. 1980); *Mobil Oil Corp. v. Department of Energy*, 610 F.2d 796 (Em.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). Similarly, if petitioners present a petition to reopen with evidence which is material and was previously unavailable, and the substantive determination is one which must be made on the basis of a consideration of all of the relevant factors, a refusal to reopen would be justified only if the Board found that the cumulative effect of the new evidence could not have affected the decision. No such finding was made in this case.

Decisions as to what circumstances constitute "extreme hardship" require delicate balancing, and are rarely made by the Board on the basis of a single factor alone. In its decisions on this issue, the Board has referred to a variety of factors. *See, e. g., In Matter of Louie*, 10 I. & N. Dec. 223 (1963); *In Matter of M____*, 5 I. & N. Dec. 448 (1953); *In Matter of T____*, 3 I. & N. Dec. 707 (1949). Indeed in this case, the Ravanchos may have been somewhat

Cir. 1980). We note that the statute does not explicitly so provide, in contrast to other statutes where Congress has expressly committed certain determinations to unreviewable agency discretion. *See, e. g.,* 38 U.S.C. § 211(a) (1976) (decisions regarding veteran's benefits).

7. The psychiatric evaluation was made July 17, 1979 and referred to the drop in Patricia's grades during the school year which had just ended. This occurred substantially after the original hearing conducted by the immigration judge on March 15, 1978.

disadvantaged because the immigration judge inexplicably erroneously mischaracterized the state of the record by his statement that the Ravanchos have no close relatives in the United States.[8] As the respondent now concedes in its brief, "Mrs. Ravancho has a brother and sister who are lawful permanent residents of the United States, and Mr. Ravancho has a brother [sic] who is a lawful permanent resident." Respondent's Brief on Rehearing, p. 12. Mr. Ravancho's sister lives in New Jersey, as do the Ravanchos. *Id.* In fact the record indicates they lived in adjoining towns at the time of the 1978 hearing. Respondent concedes that "close family ties and the interest in keeping families together are considerations in granting or denying applications for suspension," *id.* at 12, but argues that the facts do not suggest that deportation in this case will adversely affect close family relationships. Whether that is so is not a determination to be made either by this court or the Board's counsel. It is one to which the immigration judge patently did not give any weight, in light of his mistaken statement that there were no such relatives in the United States, and it is one which the Board did not address because it limited its consideration to the psychiatric evaluation alone.

The Board has expressed the concern that a requirement that it review all prior evidence with each succeeding motion, no matter how insubstantial, would impose an unnecessary burden on the Board. We are not unaware of nor unsympathetic to the Board's problems in processing the substantial caseload before it. However, since the regulations themselves limit petitions to reopen to cases where there is material new evidence previously unavailable, 8 C.F.R. § 3.2, the Board itself has limited its reopening to preclude insubstantial motions.

We read the Supreme Court's *Wang* decision as reiterating the basic precept, which our prior opinion had also referred to, that Congress entrusted to the Attorney General, and not to the courts, discretion to determine whether a petitioner has shown extreme hardship to warrant suspension of deportation. We do not read that decision as foreclosing all judicial review regarding such matters, since such review is expressly provided in the statute. 8 U.S.C. § 1105a (1976). While the scope of such review may be narrow, it extends at least to a determination as to whether the procedure followed by the Board in a particular case constitutes an improper exercise of that discretion. This court has previously held that where the record contains uncontradicted affidavits showing grounds for a suspension of deportation and yet lacks any reasoned evaluation by the INS of these grounds, an order to reopen is proper. *Martinez de Mendoza v. INS,* 567 F.2d 1222, 1224 (3d Cir. 1977). We view this case in the same light.

Accordingly, we will grant review of the order of the Board and remand so that the Board can determine whether, taking into consideration all of the relevant factors on this record, the facts set forth in the psychiatric evaluation could not have affected the substantive decision on the petition for sus-

---

**8.** The immigration judge stated:

> The issue to be resolved is whether the deportation of the respondents *who have no close relatives in the United States* would constitute extreme hardship within the contemplation of the statute. (emphasis added)

The immigration judge's statement is particularly inexplicable in light of the fact that the relevant facts were presented not only in a document which might have been overlooked but by petitioners' testimony before that very judge that Mrs. Ravancho has a permanent resident brother in active service in the United States Navy, that she has a sister who is resident in the United States, and that Mr. Ravancho has a sister who is a lawful permanent resident of the United States. In fact, the immigration judge's erroneous statement that the Ravanchos had no close relatives permanently resident in the United States was twice corrected by the petitioners at the hearing. Nonetheless, the report of the immigration judge again repeated the erroneous statement. The correct facts were again stated in the Ravanchos' affidavit on reopening, which set forth the following status of the family as of that date: Zenaida Ravancho's brother continues as a lawful permanent resident in military service, and has two children born in the United States. Her sister is a lawful permanent resident married to a United States citizen. Alejandro Ravancho's sister is a lawful permanent resident.

pension of deportation, and whether reopening would be appropriate.

ALDISERT, Circuit Judge, dissenting.

I would deny the petition for review and have previously set forth my observations in a dissent reported with the original majority opinion. There I expressed the view that the petitioners had failed to show that the Board abused its discretion in refusing to reopen or reconsider its decision denying adjustment of the petitioners' status and ordering their deportation. I restate those views here because the original opinions have been withdrawn from publication upon the grant of the government's motion for rehearing in light of the Supreme Court's subsequent decision in *I.N.S. v. Wang*, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981) (per curiam). In addition to restating my views, I will set forth my disagreements with the recast majority opinion. Essentially, the basis of our disagreement then and now is over the scope of judicial review of INS discretion.

## I.

Unlike the majority, I am unable to perform the court's reviewing function by selectively abstracting a few portions from the entire record before the Board. I am unable to do this because I recognize that the concept of discretion is founded on equitable considerations; a court that reviews for abuse of discretion, like the agency charged with its exercise, must view the totality of circumstances in reaching a decision. It cannot remove the question for decision from the larger context in which it is presented.

In their review of the record, the majority have glossed over a number of facts that I find quite revealing. For example, they ignore the deception of Mrs. Ravancho when she applied to the American consulate for a visa on September 26, 1968. At that time she claimed to be single and to be employed as a sales manager. In fact, she was married and had worked as an accounting clerk for the United States Navy. App. at 45, 111. She repeated these falsehoods on January 21, 1969, when she applied for an extension of her visa. *Id.* at 113.

The majority also ignore the record of the husband which parallels that of his wife. He first applied for a visa at the American consulate in the Philippines. After he was turned down he arranged for a "travel agency" to obtain a visa for him. He did not disclose the first rejection and, like his wife, he claimed before the authorities that he was single. Mr. Ravancho received a visa for business travel, but at the deportation hearing, he denied having any business in the United States. *Id.* at 59. At the hearing, Mr. Ravancho at first denied seeking a visa from the embassy, *id.* at 57, but finally admitted that he had. *Id.* at 68. Moreover, the evidence disclosed that the visa attached to his passport had been made out in the name of "Avan." The letters "r" and "cho" had been added in a different ink to change the name to "Ravancho." [1] *Id.* at 126–28. When questioned about the alteration, Mr. Ravancho was evasive and denied knowing about it. *See id.* at 60–61. After his arrival on December 19, 1968, he, too, applied for and received an extension of his stay, again representing that he was single. Id. at 112. He claimed on the application for an extension of his visa that he wished to continue touring the country. *Id.* The evidence disclosed that at the latest, he began working about six months later. Petitioners' brief at 84. Less than one year after this extension was granted, the Ravanchos' child, Patricia, was born. App. at 93. The immigration service thereafter granted another extension of their visas until February 7, 1974. Deportation proceedings for overstay were begun on December 5, 1977. These facts present a serious question about whether the petitioners are sincere in their application for reopening for the sake of their daughter, or

1. Evidently this visa was one of many originating in the Philippines that had been altered in a similar manner. App. at 119.

whether they are stalling for an additional extension of an illegal stay *now amounting to over seven years.*

The majority have confused the question of statutory *eligibility* under 8 U.S.C. § 1254 and the question of whether the Board can consider the totality of the circumstances in exercising its *discretion. See* maj. op. typescript at 172. As the Supreme Court made clear in *INS v. Bagamasbad,* 429 U.S. 24, 25–26, 97 S.Ct. 200–201, 50 L.Ed.2d 190 (1976) (per curiam), the Board may, but need not, exercise its discretion in favor of a petitioner once it is demonstrated that he has met the statutory requirements for relief. On the other hand the Board may properly " 'pretermit the question of statutory eligibility and deny the application . . . as an exercise of discretion' " because of misrepresentations to the immigration authorities. *Id.* at 25 (quoting the Board's decision); *see Hintopoulos v. Shaughnessy,* 353 U.S. 72, 77, 77 S.Ct. 618, 621, 1 L.Ed.2d 652 (1957). Thus, I have no quarrel with the immigration judge's determination that the petitioners met the technical requirements of 8 U.S.C. § 1254, by proving that for "seven years immediately preceding the date of application" for suspension of deportation they were "person[s] of good moral character." The undisputed facts are that their lying and cheating, and in Mr. Ravancho's case, his blatant forgery, took place earlier. I mention their sordid past conduct because the majority's bland recitation of the background of this case fails to supply the full flavor of the relevant material that was before the Board when it exercised its *discretion* in denying relief. Recognizing that these facts are not determinative, I nevertheless adhere to the view that the deceptive conduct of the petitioners extending back to

1968 should not be ignored by this court, the Attorney General or the Board. *See INS v. Bagamasbad,* 429 U.S. at 25–26, 97 S.Ct. at 200–201, and the decision it reversed, *Bagamasbad v. INS,* 531 F.2d 111, 116–18 (3d Cir. 1976) (in banc).

## II.

Turning now to the narrow focus of the majority's analysis and assuming the validity of that focus, I am unable to agree with their result. The Ravanchos have shifted emphasis in their petition to reopen, but their allegations remain substantially the same. They claim that they meet the statutory requirements, that they have relatives in this country, that they have behaved themselves while residents here, and that deportation would have a traumatic effect on their child. Their argument now, however, centers on the child and the excuse for their petition to reopen is a psychiatric evaluation of the effect of deportation on her.

In my view, the psychiatric evidence does not require the case to be reopened. Motions to reopen are governed by INS regulations, not by statute. They permit, but do not require, the service to re-examine a case previously decided when *significant* developments have occurred since the case was first heard.[2] *Jacobe v. INS,* 578 F.2d 42, 44 (3d Cir. 1978). This court has observed that the regulations bar consideration of evidence or contentions which could have been presented at the original proceeding. *Id.* In the present case the record is barren of evidence suggesting that the adjustments Patricia would need to make in moving to the Philippines could not have been presented at that time. The utterly innocuous psychiatric report, set forth in pertinent part in the margin,[3] had significance only

2. The regulation provides that:
   Motions to reopen in deportation proceedings shall not be granted unless it appears to the Board that the evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing; nor shall any motion to reopen for the purpose of affording the alien an opportunity to apply for any form of discretionary relief be granted . . . unless the relief

is sought on the basis of circumstances which have arisen subsequent to the hearing. 8 C.F.R. § 3.2 (1980).

3. The relevant portions of the report follow:
   *Psychiatric Evaluation of Patricia Ravancho*
   This 10 year old, fifth grade student was referred for psychiatric evaluation to determine [the] effect on her physical, mental and emotional stability if she is forced to return

insofar as it confirmed the obvious: "the child will miss her friends in the United States and will have to adjust to life in the Philippines." App. at 2. I submit that the symptoms described in this report would parallel those of most ten year olds facing a move to a new neighborhood or to another part of the United States, let alone to a foreign country. In this regard, it should be kept in mind that the Ravanchos are natives of the Philippines with relatives and friends there who undoubtedly could ease the strain of adjustment for their daughter. *See* app. at 85, 89. To hold that this de minimis showing requires the Board to reopen a deportation hearing is to invite every deportable alien to challenge endlessly the Board's procedures. My views on this have not changed since the time the petition for review was originally presented. The Board implicitly found that the new evidence failed to meet the threshold requirement of materiality and, therefore, in my view, properly dismissed the motion.

The majority also consider significant the immigration judge's error in stating that the Ravanchos have no close relatives in the United States. Maj. op. typescript at 175. The history of § 1254(a) discloses

that it was intended to deal with hardships to family relationships which would result from deportation. C. Gordon & H. Rosenfield, Immigration Law and Procedure § 7.9a (1980). The Ravanchos never attempted to demonstrate that they had any relationship with these family members, let alone that they would suffer from moving back to the country where their parents and other relatives live. Because there was no evidence of hardship either to the family members in the United States or to the Ravanchos, the error of the immigration judge was immaterial.[4]

### III.

My principal disagreement with the majority, however, is their cavalier treatment of the Supreme Court's decision in *I. N. S. v. Wang*, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981) (per curiam). While not identical with the *facts* presented here, *Wang* addresses the specific *problem* before us in this case: the appropriate scope of judicial review of INS discretion. Unlike the majority, I read that decision broadly because I believe that the Court was deciding more than the issue presented by the precise facts before it. The Court was sig-

to the Philippines. Patricia was born in the United States and does not [speak] Tugallah.
. . . .
*Interview with Patricia:*
This clean, neat, well developed and well nourished, quiet, inhibited 10 year old sat anxiously awaiting her turn to be interviewed. She wrote her name very neatly in script, gave her age, grade, date of birth, address and school. Anxiety was revealed in her voice.
She was able to talk about her friends and her interests.
School has been all right for her except "arithmetic", "fractions", and "measurement".
This year her grades have gone down.
Fears are of "being frightened by other people", "heights", "bugs", "beetles", "wild animals", and "dying".
Ambition is to be a doctor.
When asked about her 3 wishes, she was able to state only one "Not have to go to the Philippines". When asked why she would not want to go there, she replied, "I would have to leave all of my friends whom I have known since kindergarten." She also men-

tioned the language problem, climate, and food.
Health: Health has been good. Sometimes she has trouble sleeping when weather is hot. Her insecurities were revealed in her HTP drawings. It took her a while to do the person, and she was so fearful of making a mistake that she traced the figure in the air first. When she called it "finished" there was no face or hands.
The house and tree showed isolation and inaccessibility.
*Impression:* Insecure child who relies on known friends and relatives for guidance and security.
App. at 8, 9.

**4.** The majority conclude that the Board did not consider the residence of these family members in its decision to reopen "because it limited its consideration to the psychiatric evaluation alone." Maj. op., at 176. I read the record differently. The residential status of the Ravanchos' relatives was set forth in the affidavit appended to their motion to reopen. App. at 6. The Board then considered both the affidavit and the psychiatric evaluation. *See* note 5, *infra.*

nalling to the courts of appeals the proper degree of deference to be accorded the Board's decisions on reopening. This reading is mandated because the Court did not stop with identifying the ninth circuit's error in ignoring the INS regulation requiring a petition to reopen to be supported by affidavits. That error alone would have justified the decision. Instead, the Court identified what it described as the circuit court's "fundamental" error of improvidently encroaching on the discretionary authority of the Attorney General and his designees. My reading of *Wang* convinces me that the majority here commit the same fundamental error as did the ninth circuit.[5]

Of particular relevance to the case before us is the language quoted by the Court in *Wang* from Judge Wallace's dissent in *Villena v. INS*, 622 F.2d 1352, 1362 (9th Cir. 1980) (in banc), decided by the ninth circuit with *Wang*:

> If INS discretion is to mean anything, it must be that the INS has some latitude in deciding when to reopen a case. The INS should have the right to be restrictive. Granting such motions too freely will permit endless delays of deportation by aliens creative and fertile enough to continuously produce new and material facts sufficient to establish a prima facie case. It will also waste the time and efforts of immigration judges called upon to preside at hearings automatically required by the prima facie allegations.

*Quoted* 450 U.S. at 143 fn. 5, 101 S.Ct. at 1031 fn. 5. The Court quoted this language in connection with its recognition that the regulation providing for a procedure to reopen is framed negatively; it directs that the Board may not reopen absent a showing of specified conditions: "Thus the regulations may be construed to provide the Board with discretion in determining under what circumstances a proceeding should be reopened." *Id.* The Court then explained the legitimate government interest in limiting conditions on which reopening would be granted. The majority here, like the discredited ninth circuit *Wang* court, would require a reopening upon a minimal showing. *See* 450 U.S. at 144, 101 S.Ct. at 1031. This deprives the Board of its discretionary authority to determine under what circumstances reopening should be granted.

The majority pay only lip service to the legitimate interest of the government "in creating official procedures for handling motions to reopen deportation proceedings so as readily to identify those cases raising new and meritorious considerations." *Wang*, 450 U.S. at 145, 101 S.Ct. at 1031. The reason for according such procedures deference is clear: it is unfair to allow those aliens who have deliberately flouted the immigration laws to find shelter in those same laws, absent extraordinary circumstances, while requiring patient, law-abiding citizens of foreign states to follow the letter and spirit of the laws while awaiting a quota. *See Acosta v. Gaffney*, 558 F.2d 1153 (3d Cir. 1977). The minimal showing that satisfies the majority will in-

---

**5.** The majority attempt to distinguish *Wang* on the ground that there the Board undertook a cumulative review of the evidence presented, whereas here the Board reviewed only the new evidence. Maj. op., typescript at 11. The majority indicates the Board's reference to the psychiatric report and its statement that "[t]his is not the type of extreme hardship necessary for a grant of suspension of deportation ...." *Id.* A reading of the entire paragraph reveals that this was not the case. The Board considered *both* the Ravanchos' affidavit which set forth the facts on which they based their initial petition for relief, *and* the psychiatric report:

> The only evidence submitted in support of the respondents' motion is *their own affidavit and a psychiatric evaluation of their ten-year-*

*old United States citizen child.* This evidence does not establish the necessary hardship to the respondents or to their daughter for the purposes of relief from deportation under section 244 of the Immigration and Nationality Act, 8 U.S.C. 1254. Although the respondents have placed great reliance on the report of Dr. Prystowsky on their daughter, we find that it indicates no more than that the child will miss her friends in the United States and will have to adjust to life in the Philippines. This is not the type of extreme hardship necessary for a grant of suspension of deportation and, accordingly, we will deny the respondents' request for reconsideration.

App. at 2 (my emphasis).

evitably bring about further delays in this case, and worse, the decision invites any similarly situated alien to begin anew a groundless course of agency and judicial proceedings.

## IV.

Notwithstanding my conviction that the majority have erred, I note that they have now narrowed their holding. The former decision was a "remand so that deportation proceedings can be reopened to permit consideration of the newly proffered evidence together with all of the prior evidence in determining whether deportation will cause extreme hardship to Patricia and/or the Ravanchos." This decision assumed the materiality of the psychiatric report without accounting for INS discretion in this regard and, for all practical purposes, would have required reopening in every case. The new majority opinion is more cautious. It directs a remand "so that the Board can determine whether, taking into consideration all of the relevant factors on this record, the facts set forth in the psychiatric evaluation could not have affected the substantive decision on the petition for suspension of deportation, *and whether reopening would be appropriate.*" Maj. op. at 176–177 (my emphasis).

As I understand the majority, the remand is for a determination of whether the new evidence meets the test of materiality set forth in 8 C.F.R. § 3.2. *See* note 2, *supra.* If the evidence is immaterial, the Board need not reopen. Considering all of the factors presented, the standard of materiality is the extent to which the facts could have an effect on the decision if reopening were granted. I remain convinced that the Board has already made this determination by its statement that the psychiatric report "indicates no more than that the child will miss her friends in the United States and will have to adjust to life in the Philippines." App. at 2. In light of this statement, a remand for the sole purpose of stating in exquisite detail what is so plain on its face seems at best frivolous, and at worst to play squarely into the hands of petitioners' strategy to delay their inevitable deportation and to make a mockery of the judicial process.

I trust that the mandate will issue in due course in this case so that the petitioners will profit no more by their delay strategy. With a view toward hastening the termination of these proceedings, I note that rehearing in banc is not indicated here because what separates the court is not the choice or interpretation of a legal precept, but only its application to the facts at bar. *See* United States Court of Appeals for the Third Circuit, Internal Operating Procedures, § VIII. What the majority have done is, in Karl Llewellyn's words, to treat the Supreme Court's decision in *Wang* as an "unwelcome precedent." Their grudging use of that decision seems to say that "[t]he rule holds only of redheaded Walpoles in pale magenta Buick cars." [6] I am confident that the majority's singular treatment of the Supreme Court's direction will have little precedential or institutional value in this or in other courts.

---

**6.** K. Llewellyn, The Bramble Bush 66–67 (1960).